**ACTIVE FIRE SPRINKLER CORP.,**
**Plaintiff-Appellant,**

v.

**The UNITED STATES POSTAL SERVICE and John T. Brady and Company, Defendants-Appellees.**

**No. 1233, Docket 86–6034.**

United States Court of Appeals,
Second Circuit.

Argued April 28, 1986.
Decided Feb. 3, 1987.

Thomas G. Deluca, New York City (James F. Forster, Postner & Rubin, New York City, of counsel), for plaintiff-appellant.

Thomas P. Battistoni, Asst. U.S. Atty., Brooklyn, N.Y. (Reena Raggi, U.S. Atty. for E.D.N.Y., Robert L. Begleiter, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for defendant-appellee U.S. Postal Service.

Ira M. Schulman, New York City (Frederick Cohen, Ross & Cohen, New York City, of counsel), for defendants-appellees John T. Brady and Co. and Federal Ins. Co., et al.

Before NEWMAN, PIERCE and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from an order of the United States District Court for the Eastern District of New York (Nickerson, Judge) granting the appellees' motions for summary judgment, dismissing appellant's claims against the appellees, and remanding to the state court. Appellant claims that the district court erred in dismissing its equitable lien claim against the United States Postal Service and erred in granting summary judgment to the bond sureties against the Postal Service. We reverse in part and remand for further proceedings consistent with this opinion.

## BACKGROUND

### 1. *The Construction Contract*

In January 1977, the United States Postal Service ("USPS") contracted with John T. Brady and Company ("Brady" or "general contractor") for the construction of an airmail facility at John F. Kennedy International Airport. The cost of the building was $40.6 million. Brady, as general contractor and principal, furnished a payment bond pursuant to the Miller Act, 40 U.S.C. §§ 270a–270f (1982), for the statutory maximum amount of $2.5 million. Named in the bond were a number of insurance companies which acted as sureties ("the Sureties").[1]

The Miller Act provides that the general contractor must post a payment bond in an amount equal to a set percentage of the total amount payable on the construction contract, up to a maximum of $2.5 million, for the protection of all persons who supply labor or materials for the project. 40 U.S.C. § 270a(a)(2) (1982). If the general contractor fails to pay, persons who supply labor or materials may sue the surety to recover under the bond. *Id.* § 270b.

The plumbing and sprinkling system portion of the project was subcontracted by Brady to plaintiff-appellant Active Fire Sprinkler Corporation ("Active") in March 1977. The amount of the subcontract was $1.7 million. It is undisputed that Active completed performance of its obligations under the subcontract during 1981.

---

1. The Miller Act provides for the protection of subcontractors, laborers and material suppliers on government building projects. When the act was created, it was deemed necessary because subcontractors were unable to assert liens against government property due to governmental immunity. *United States v. Ansonia Brass & Copper Co.*, 218 U.S. 452, 471, 31 S.Ct. 49, 54, 54 L.Ed. 1107 (1910). The earliest predecessor of the Miller Act was the Act of Aug. 13, 1894, ch. 280, 28 Stat. 278, as amended by the Act of Feb. 24, 1905, ch. 778, 33 Stat. 811. The Miller Act was enacted in 1935, Act of Aug. 24, 1935, ch. 642, 49 Stat. 793, and is codified as amended at 40 U.S.C. §§ 270a–270f (1982).

Upon completion of the project, before paying the subcontractors (including Active), Brady encountered financial problems and assigned its rights under the government contract to the Sureties in November 1982. Apparently, by mid–1982 numerous unpaid subcontractors, but not Active, had presented claims against Brady and against the Miller Act bond, which in the aggregate exceeded the $2.5 million bond amount.

### 2. The "Bond Action"

In August 1982, the Sureties commenced an interpleader action (the "Bond Action") in the United States District Court for the Eastern District of New York by depositing $2.5 million, seeking to discharge their liability under the bond. After Brady assigned its rights to the Sureties in November 1982, Active moved in February 1983 to intervene as a defendant in the interpleader action. On March 31, 1983, Judge Nickerson denied Active's motion to intervene on the ground that it had failed to sue timely on the bond since the Miller Act provides that suit must be brought within one year of the last day materials or labor were supplied for the project. 40 U.S.C. § 270b(b) (1982). Although Active completed work on the project in 1981, it had not sought to intervene in the Sureties' interpleader action until February 1983. The Bond Action is not the subject of this appeal.

### 3. The "Lien Action"

Also in February 1983, Active commenced the present suit (the "Lien Action") against USPS in the New York State Supreme Court for Kings County. In the Lien Action, Active sought to recover from USPS a balance of $256,850.48 allegedly owed by Brady to Active under the subcontract. Active sought to recover this amount by requiring USPS, under an equitable lien theory, to pay over to it any money owed by USPS to Brady as the general contractor. Apparently, at the time the Lien Action was commenced in February 1983, USPS had remaining over

$900,000 earmarked to be paid to Brady under the construction contract (the "Contract Balance"). On March 25, 1983, USPS removed the Lien Action to the federal court, where it was assigned to Judge Nickerson, and USPS immediately moved for dismissal of Active's complaint on sovereign immunity grounds.[2] It appears that the Bond Action was settled in early 1984. The district court denied USPS's first motion to dismiss the Lien Action in July 1983, holding that by enacting the Postal Reorganization Act ("PRA"), Congress had waived sovereign immunity as to USPS. See 39 U.S.C. § 401 (1982).

Meanwhile, in May and December of 1983—after Active had commenced its suit against USPS—USPS made a number of payments from the Contract Balance earmarked for the Brady contract. Interrogatory answers by Brady indicate that these payments totaled $936,021 and were made to the Sureties ($857,779) and to several of Brady's creditors, who apparently were subcontractors on the project ($78,242).

Eventually, Active amended its complaint to join Brady as a defendant. However, since Brady might not have sufficient resources to satisfy a judgment against it, Active primarily sought recovery against USPS.

### 4. The Summary Judgment Motions in the Lien Action

In August 1985, Active moved for partial summary judgment against USPS and Brady in its Lien Action. In an affidavit by Thomas G. De Luca, Active asserted that between the commencement of its suit in "March [sic] 1983" and the time its motions for partial summary judgment were made in August 1985, USPS paid out of the Contract Balance to Brady's creditors or to the Sureties a total of $936,021, as stated above, and that it believed that USPS still held $36,294 of the Contract Balance. There appears to be no dispute that Brady owes Active at least $82,226.67 of the total

---

**2.** The Lien Action and the Bond Action were not consolidated.

amount of $256,850.48 claimed by Active to be owed by Brady under the subcontract.

Active claims that as an unpaid subcontractor on a federal construction project it may, on notice to USPS, assert an equitable lien against any money held by USPS for the account of the general contractor, Brady. Active further asserts that USPS breached its duty as a "stakeholder" by making payments under the contract to Brady's creditors and to the Sureties after Active placed USPS on notice as to Active's claim by commencing this lawsuit. Thus, Active contends that it is entitled to summary judgment against USPS for the "undisputed" $82,226.67. Active also believes that it should be allowed to pursue its claims in the Lien Action against USPS and Brady for the remainder of the $256,850.48 it alleges Brady owes Active under the subcontract. Although Active sued for that amount and then moved in August 1985 for partial summary judgment against both Brady and USPS for the undisputed subcontract balance of $82,226.67, it did not seek a provisional remedy to restrain USPS from paying the Contract Balance to Brady or the Sureties pending resolution of this suit.

In August 1985, Brady moved for summary judgment dismissing plaintiff's equitable lien claim (1) against the money held by USPS and (2) against any funds paid to Brady's creditors or to the Sureties. Brady also sought dismissal or remand to the state court of Active's remaining contract claims, which were based on state law and concerned only Brady, for lack of subject matter jurisdiction.

Also in August 1985, the Sureties moved to intervene in the Lien Action under Fed. R.Civ.P. 24 and for summary judgment on their cross-claim against USPS for the remainder of the Contract Balance ($36,294) held by USPS after it made the payments discussed above. In October 1985, USPS moved in the Lien Action under Fed.R. Civ.P. 22 to interplead this $36,294 remainder of the Contract Balance and for summary judgment dismissing all the other claims against it.[3]

USPS, Brady and the Sureties argued in the district court that Active could not assert an equitable lien against any money held by USPS because Active had failed to pursue its remedies timely. Appellees also urged that the Sureties, as subrogees to the rights of the subcontractors who had been paid and, pursuant to the November 1982 assignment, as assignees of Brady's rights, had rights superior to those of Active.

The district court denied Active's motion for partial summary judgment as to the $82,226.67. It granted Brady's motion for summary judgment dismissing Active's equitable lien claim against any of the Contract Balance still held or already paid out by USPS. The Sureties' motions to intervene and for summary judgment in the amount of $36,294 against USPS were granted. The court further ruled that after USPS paid the remaining $36,294 to the Sureties, "the proceeding against the Postal Service is dismissed as to all claims." The court then remanded the remaining claims, which were against Brady and based on state law, to the New York State Supreme Court for Kings County.[4]

In summary, subject to this appeal, all of Active's claims against USPS have been dismissed; the Sureties have collected the remainder of the Contract Balance from USPS; USPS currently has no claims pending against it in this action; Active remains free to pursue its claims against Brady in the state court.

On appeal, Active argues that the trial court erred in dismissing Active's claim against USPS, that USPS improperly paid

---

3. Apparently, USPS never actually paid the $36,294 into court. It appears instead that after the district court granted the Sureties' motion for summary judgment, see *infra*, USPS paid the money directly to the Sureties.

4. Judge Nickerson did not determine whether Active had asserted valid claims against Brady since his order remanded these claims to the state court and we need not determine this issue since we do not direct entry of judgment in favor of Active at this time. See note 8, *infra*.

out over $900,000 from the Contract Balance while on notice of Active's claim of $256,850.48, and that the trial court erred in granting summary judgment to the Sureties against USPS for the remaining Contract Balance of $36,294. Thus, Active argues for the reinstatement of its $256,-850.48 equitable claim against USPS. It next asserts that since the restoration of the claims would bring USPS back into the case, the district court would have a subject matter jurisdictional basis for entertaining Active's pendent state law claims against Brady. Thus, we are asked to vacate the remand to the New York Supreme Court of Active's claims against Brady. Active further argues that since $82,226.67 of its claim is "undisputed" we should direct the district court to enter partial judgment in that amount in favor of Active and against Brady and USPS.

We reverse in part and remand for further proceedings consistent with this opinion.

## DISCUSSION

### 1. *Governmental Immunity*

Before proceeding to the merits of the appellant's substantive claims, we address the argument by USPS that it retains sovereign immunity and cannot be sued.

 The Postal Reorganization Act provides that USPS shall have the power "to sue and be sued in its official name." 39 U.S.C. § 401(1) (1982). It seems well settled that this language constitutes a broad waiver of sovereign immunity. According to a unanimous Supreme Court, we must presume USPS to be no less amenable to judicial process, and no less subject to liability for its acts, than any other business enterprise. *Franchise Tax Board v. USPS*, 467 U.S. 512, 517–18, 520, 104 S.Ct. 2549, 2552–53, 2554, 81 L.Ed.2d 446 (1984) (citing *FHA v. Burr*, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940)); *see also Beneficial Finance Co. v. Dallas*, 571

F.2d 125, 127–28 (2d Cir.1978). This presumption may be rebutted only under certain circumstances: (1) when the waiver of sovereign immunity would conflict with a statutory or constitutional scheme; (2) when plain Congressional intent points toward a restrictive reading of the waiver; or (3) when a broad reading would lead to grave interference with an important agency function. *Beneficial Finance Co.*, 571 F.2d at 128; *see Franchise Tax Board*, 467 U.S. at 517–18, 104 S.Ct. at 2552–53.

The appellees argue that Congress intended to limit the waiver of governmental immunity and assert that the incorporation of the Miller Act remedy into the PRA, *see* 39 U.S.C. § 410(b)(4)(B) (1982), evidences Congress's intent that the Miller Act provide the only remedy for subcontractors, laborers and suppliers.

 The Miller Act does not provide subcontractors with a right of recovery against the United States. *See United States v. Munsey Trust Co.*, 332 U.S. 234, 241, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947). However, it was passed against a background of broad governmental immunity with the apparent intent to protect subcontractors. *United States v. Ansonia Brass & Copper Co.*, 218 U.S. 452, 471, 31 S.Ct. 49, 54, 54 L.Ed. 1107 (1910). We can find no evidence of a clear intent on the part of Congress that the incorporation of the Miller Act remedy into the PRA was to serve to narrow the waiver contained in the "sue or be sued" language of section 401 of the PRA.[5] Indeed, as discussed below, we construe the incorporation of the Miller Act into the PRA as an addition to any remedies made available by means of the waiver of immunity. *See Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 139–40, 83 S.Ct. 232, 236, 9 L.Ed.2d 190 (1962).

In *Pearlman*, it was argued that the Miller Act had repudiated an equitable doctrine recognized in two earlier Supreme Court cases that, where a payment surety satisfies the claims of unpaid "material-

5. Our search of the legislative history of the PRA reveals no statement indicating why the Miller Act was incorporated into the PRA.

men and suppliers" in a government building contract, the surety becomes subrogated to their rights in any part of the contract price still owed by the government to the general contractor. *See id.* at 137–39, 83 S.Ct. at 235–36 (discussing *Henningsen v. United States Fidelity & Guaranty Co.,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), and *Prairie State Bank v. United States,* 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896)). The Supreme Court rejected the argument, stating that it was unpersuaded that "Congress in passing the Miller Act intended to repudiate equitable principles so deeply imbedded in our commercial practices, our economy, and our law as those spelled out in the *Prairie Bank* and *Henningsen* cases." *Id.* at 140, 83 S.Ct. at 236. Since *Pearlman* suggests that a surety's right in this kind of situation is based on subrogation to the rights of subcontractors, and since *Pearlman* instructs us that the surety's right survives the Miller Act, it follows that the Miller Act does not evidence an intent to eliminate any rights that subcontractors might possess. More likely, the purpose of incorporating the Miller Act was to ensure the continued protection afforded subcontractors by the Miller Act bond.

One might note that the PRA also incorporated the provisions of the Federal Tort Claims Act ("FTCA"). *See* 39 U.S.C. § 409(c) (1982). And by doing so, Congress explicitly has narrowed the waiver of immunity contained in the "sue or be sued" clause of section 401(1). *Insurance Co. of North America v. USPS,* 675 F.2d 756, 758 (5th Cir.1982) (per curiam); *Grasso v. USPS,* 438 F.Supp. 1231, 1233–34 (D.Conn. 1977); *cf. Loeffler v. Tisch,* 806 F.2d 817, 820 (8th Cir.1986) (en banc) (Title VII). By analogy, one might conclude that the Miller Act also served to limit the PRA's waiver of immunity. However, we are unpersuaded by this analysis. First, the FTCA was itself a waiver of sovereign immunity. Its inclusion in the PRA thus requires courts to apply the FTCA's limiting provisions in suits against USPS. However, the Miller Act was not a waiver of immunity. See *supra.* Moreover, the section of the PRA

incorporating the FTCA is entitled "Suits by and against the Postal Service," and deals explicitly with the jurisdiction of federal courts over suits brought by and against USPS. *See* 39 U.S.C. § 409 (1982). By contrast, the section incorporating the Miller Act is entitled "Application of other laws" and lists several administrative statutes with which USPS must continue to comply. *See id.* § 410; *see, e.g.,* 42 U.S.C. §§ 4151–4157 (1982) (relating to design of government buildings to accommodate handicapped); 20 U.S.C. § 107 (1982) (relating to vending machines operated by the blind); 29 U.S.C. § 668 (1982) (relating to Occupational Safety and Health Act). Unlike the FTCA, not all of the statutes incorporated contain explicit language relating to suits against the government. *See, e.g.,* 20 U.S.C. § 107 (vending machines operated by the blind); 40 U.S.C. §§ 270a–270f (1982) (Miller Act). Since plain Congressional intent must be present for us to adopt a restrictive reading of the PRA's language broadly waiving immunity, *Beneficial Finance Co.,* 571 F.2d at 128, and the Miller Act contains neither plain language limiting one's ability to sue federal agencies nor clear evidence of an intent to do so, we conclude that governmental immunity presents no barrier to the assertion by Active of its equitable claim against USPS herein.

### 2. *The Equitable Claims of Active*

Active argues that as an unpaid subcontractor, it had an equitable interest in the Contract Balance held by USPS at the time it commenced this Lien Action. It further argues that any interest of the Sureties in that balance was inferior to that of Active and that therefore both USPS and the Sureties should be held liable to Active for its share of the Contract Balance that was held by USPS at the time Active made its claim.

This argument raises four principal issues. First, we must decide whether the Miller Act replaces and eliminates all other remedies available to construction subcontractors and suppliers for government

projects. If it does, Active cannot succeed with its claim against USPS for the unpaid Contract Balance. Next, we must determine what equitable rights may be held by each party in the unpaid Contract Balance, and the order of priority of any such rights. We then will consider the issue of laches. Finally, we must decide what effect to give to USPS's payment (of the remaining balance it owed to Brady) to the Sureties and others after Active commenced this lawsuit.

We conclude that the Miller Act is not an exclusive remedy as to USPS since the United States has waived USPS's immunity from suit. We further conclude that Active held an equitable interest in the unpaid contract fund, that Active's interest in the fund superseded the Sureties' interests, and that the doctrine of laches does not prevent such a recovery. Although Active did not seek a provisional remedy prior to and even after the district court's determination, Active still may proceed on its claim to recover fully from USPS.

### A. The Miller Act's Effect on Common Law Remedies

█ Appellees suggest that the Miller Act eliminated all other remedies available to subcontractors and suppliers in government construction projects and by incorporating it into the PRA Congress limited subcontractors in USPS construction projects to a sole remedy, namely, that provided in the Miller Act. In support of this position, appellees cite a long series of cases that characterize the Miller Act as the only remedy for subcontractors in a government building contract and which suggest that no remedy for the subcontractors exists as against the United States.[6] They further argue that an equitable reme-

dy is available only when the government fails to require posting of a Miller Act bond before contracting with the general contractor, with the possible effect of leaving the subcontractors and suppliers unprotected. *See Kennedy Electric Co. v. USPS,* 508 F.2d 954, 957-58 (10th Cir.1974) (equitable remedy available where USPS fails to require posting of Miller Act bond). We are not persuaded by these arguments.

First, we note that none of the cases cited by appellees for the proposition that the Miller Act is the subcontractor's sole remedy involved a government agency whose immunity had been waived. See cases cited in note 6, *supra.* In those cases the Miller Act offered the sole remedy because no lien could attach to property held by the United States government. Herein, the United States has waived its immunity and, by doing so, the United States has accepted the possibility of liability being imposed against the agency. See Part 1, *supra.* Prior to the waiver of immunity, subcontractors possessed an equitable right, as evidenced by *Henningsen* (see Part 1, *supra* ), but apparently lacked a remedy due to immunity. Any equitable rights held by subcontractors as against USPS, which may have been unenforceable where sovereign immunity existed, became enforceable upon immunity being waived.

Appellees' reading of the Miller Act conflicts with the purpose behind its enactment as evidenced by its function. The Act provided recourse for subcontractors and suppliers, who had been left without a remedy as to the government under then-existing law when the general contractor became insolvent. *See Ansonia Brass & Copper Co.,* 218 U.S. at 471, 31 S.Ct. at 54. Since the plain language of the Miller Act

6. *E.g., Arvanis v. Noslo Eng'g Consultants, Inc.,* 739 F.2d 1287 (7th Cir.1984) (per curiam), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 964, 83 L.Ed.2d 969 (1985); *United States for the use of Aetna Drywall Contractors, Inc. v. Aetna Casualty & Sur. Co.,* 725 F.2d 650 (11th Cir.1984) (per curiam); *Warrior Constructors, Inc. v. Harders, Inc.,* 387 F.2d 727 (5th Cir.1967); *United States for the use of B's Co. v. Cleveland Elec. Co.,* 373 F.2d 585 (4th Cir.1967); *Fanderlik-Locke Co. v.*

*United States,* 285 F.2d 939 (10th Cir.1960), *cert. denied,* 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961); *United States for the use of Industrial Contractors Corp. v. William Clairmont, Inc.,* 341 F.Supp. 940 (D.Neb.1972); *Fett Roofing & Sheet Metal Co. v. Seaboard Sur. Co.,* 294 F.Supp. 112 (E.D.Va.1968); *United States for the use of Brown Bros. Grading Co. v. F.D. Rich Co.,* 285 F.Supp. 572 (D.S.C.1968).

relates only to creation of a remedy for subcontractors as against sureties, as we construe it, it does not limit Active's rights vis-a-vis the government herein.

The Sureties also argue that it would be inequitable to allow Active to press its claim. Presumably, this alleged inequity harms the other subcontractors who pursued their claims in a timely fashion and would now be forced to compete with Active, which filed its Miller Act claim too late. Active would unfairly be allowed to avoid the consequences of failing to assert its Miller Act claim timely. The Sureties' argument does not comport with Active's theory since the other subcontractors will not have to compete with Active for the funds available under the $2.5 million Miller Act bond—that question already was decided against Active in the Sureties' Bond Action. The Bond Action is not before us on appeal. Here, Active seeks to recover based only upon its equitable claim in the Lien Action. Thus, Active would be in competition with the other subcontractors only if they, too, have asserted equitable claims against the Contract Balance.

### B. The Equitable Rights of the Parties

Active asserts that it had equitable rights in the Contract Balance held by USPS at the time this suit (the Lien Action) was commenced. We agree. It is not new law that unpaid subcontractors hold an equitable interest in a contract balance owed by a building owner to a general contractor. Restatement of Security § 141 (1941); *id.* § 141 comment e; *see Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 410, 28 S.Ct. 389, 391, 52 L.Ed. 547 (1908); *Matter of Dutcher Construction Corp.*, 298 F.2d 655, 658 (2d Cir.) (quoting *National Surety Corp. v. United States*, 133 F.Supp. 381, 384, 132 Ct.Cl. 724, *cert. denied*, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955)), *aff'd sub nom. Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The key question here is what comparative priority each party retained with respect to

the unpaid Contract Balance as of the time this suit was commenced.

■ USPS makes no claim to that balance—however, it does agree with the Sureties that the Sureties' claim to the balance defeats Active's claim. The appellees make two main arguments to support this assertion. First, they argue that the Sureties have the better claim because Brady assigned all its rights under the contract with USPS to the Sureties. However, it is elementary that an assignee generally takes a right subject to any claims superior to that right. *See* Restatement (Second) of Contracts § 343 (1979); *id.* comment b; 4 Corbin on Contracts § 900, at 608 (1951); *id.* § 901, at 610. Thus, the Sureties had no better right in the unpaid balance based on the assignment than did Brady, the insolvent general contractor that failed to pay Active.

The second claim to priority made by the Sureties is that their equitable right to the unpaid balance defeats that of the subcontractor. The Sureties reach this conclusion by interpreting the relevant cases incorrectly. Several cases are cited for the proposition that the surety has *the* highest priority claim to an unpaid contract balance when a general contractor fails to meet its obligations to subcontractors. *See, e.g., Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); *Henningsen, supra; Prairie State Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896). However, to determine whether the Sureties' claims supersede the claim of Active, we first must understand the derivation of each party's rights.

Simply put, the equitable rights of sureties derive from the equitable rights of the class protected by the bond—in this case, the subcontractors. In *Henningsen,* the Supreme Court stated that the government has an equitable obligation to ensure the payment of laborers and suppliers on government construction projects. 208 U.S. at 410, 28 S.Ct. at 391. *Pearlman* states that laborers have the right to be paid out of an unpaid contract balance

when an insolvent general contractor fails to pay them. 371 U.S. at 141, 83 S.Ct. at 237. In both cases, the sureties, who had compensated the unpaid laborers and suppliers, had claims to the unpaid contract balances superior to the claims of bankruptcy estates and creditors. The sureties' claims arose because the sureties were subrogated to the rights of the suppliers and laborers. *See id.; Henningsen,* 208 U.S. at 410, 28 S.Ct. at 391. Any rights held by the sureties were founded upon the rights of the unpaid laborers and suppliers. *See generally* Brady, *Bonds on Federal Government Construction Contracts: The Surety's View,* 46 N.Y.U.L.Rev. 262, 269–76 (1971); Note, *Reconsideration of the Subrogative Rights of the Miller Act Payment Bond Surety,* 71 Yale L.J. 1274 (1962).

The district court distinguished *Henningsen* and *Pearlman* from this case, observing that in each of those cases the sureties were the parties who were afforded the protection of equity. This distinction is unpersuasive in relation to the facts of this case. First, we would hardly hold that a subrogee (e.g., the Sureties) may enforce a right after becoming subrogated to it, but that the original owner of the right (e.g., the subcontractors, including Active) may not enforce the right before the subrogation occurs. Second, the distinction lacks a basis in the settled law of suretyship. As a general rule, "[w]here the duty of the principal [Brady] to the creditor [subcontractors, including Active] is *fully* satisfied, the surety to the extent that he has contributed to this satisfaction is subrogated (a) to the rights of the creditor against the principal...." Restatement of Security § 141 (1941) (emphasis added); *see In re Yale Express System, Inc.,* 362 F.2d 111, 114–15 (2d Cir.1966) (Friendly, J.); *American Surety Co. v. Bethlehem National Bank,* 116 F.2d 75, 76 (3d Cir.1940), *rev'd on other grounds,* 314 U.S. 314, 62 S.Ct. 226, 86 L.Ed. 241 (1941); *In re Buildice Co.,* 146 F.Supp. 911, 914, 915 (N.D.Ill.1956); *United States Casualty Co. v. Jungreis,* 21 A.D.2d 769, 769, 250 N.Y.S.2d 749, 750 (1st Dep't 1964) (per cu-

riam); 11 J.A. Appleman & J. Appleman, Insurance Law & Practice § 6509, at 452–53 (1981 rev.); *see also* Restatement of Restitution §§ 161, 162 (1936). More specifically, a surety is not subrogated to the rights of the creditors (subcontractors, including Active), nor to the creditors' interests in security, as long as the creditors retain any interest in the right or the security. Restatement of Security § 141 comment e (1941); 11 J.A. Appleman & J. Appleman, *supra.* It follows that a surety on a payment bond for the protection of subcontractors on a construction contract may share in the unpaid balance of the contract, subject, however, to the satisfaction of the subcontractors' claims in full. *Id.* § 141 illustration 9; *see Buildice Co.,* 146 F.Supp. at 914, 915; *North Denver Bank v. United States,* 432 F.2d 466, 472–73, 193 Ct.Cl. 225 (1970) (per curiam); *see also* 11 J.A. Appleman & J. Appleman, *supra,* § 6509, at 452–53 (generally, surety not entitled to subrogation rights until person to be benefitted by bond has been paid *in full* ). *See generally* 11A J.A. Appleman & J. Appleman, *supra,* § 6606 (summarizing subrogation rights of construction payment bond sureties). This is true even if the surety has paid the full sum of the bond. *North Denver Bank,* 432 F.2d at 472. Thus, although the Sureties are subrogated to the claims of any subcontractors whose claims they have paid, their claims are inferior to those of any remaining unpaid subcontractors, including Active. This approach seems sensible in light of the purpose of a payment bond, namely, protecting the subcontractors.

The implications of these rules for this case are clear. At the time Active commenced this suit, it was entitled to a share of any unpaid Contract Balance held by the USPS. As an unpaid creditor, Active's claim had priority over the Sureties' claim to that balance. However, the USPS argues that the doctrine of laches prevents Active from asserting its equitable claim.

### C. Laches

USPS urges that by failing to sue within the one year statute of limitations of

the Miller Act, 40 U.S.C. § 270b(b) (1982), Active has caused its claim to be precluded in part pursuant to the principle that "equity will withhold its remedy if the legal right is barred by the local statute of limitations." *Russell v. Todd,* 309 U.S. 280, 289, 60 S.Ct. 527, 532, 84 L.Ed. 754 (1940); *see also Public Administrator of the County of New York v. Angela Compania Naviera, S.A.,* 592 F.2d 58, 64 (2d Cir.), *cert. dismissed,* 443 U.S. 928, 100 S.Ct. 15, 61 L.Ed.2d 897 (1979). We disagree. The Miller Act's one year statute of limitations applies only to claims made against the bond. The unpaid Contract Balance presents different issues. Since the unpaid balance is a contractual obligation, the most likely applicable statute of limitations is New York's six year limit for contract actions. N.Y.Civ.Prac.Law § 213.2 (McKinney Supp.1986). This time limit had not yet been reached when this action was commenced.

■ We next inquire whether Active inexcusably slept on its rights, thus rendering any enforcement of its rights against USPS unfair. *See Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 65 (2d Cir. 1983). The key question here is whether USPS was prejudiced by Active's delay. *See id.* It appears from the record that USPS, at the time this action was commenced, still owed Brady over $900,000 under the contract. If so, it is difficult to see how USPS would have been prejudiced by having to pay part of those funds to Active.

We therefore are not persuaded that Active's claim against USPS is defeated by the doctrine of laches.

### D. The Effect of Active's Failure to Seek an Injunction or a Stay.

■ We do not doubt that USPS stood in a difficult position. On the one side, the Sureties were seeking payment of the amount owed to Brady under the contract pursuant to the assignment by Brady of its contract rights to the Sureties and as a matter of subrogation to the claims of sub-

contractors who recovered under the bond. On the other side was Active, which had commenced a suit under its equitable lien theory. However, we cannot accept USPS's position that its payment to the Sureties frees it from liability to Active. To do so would allow USPS, as a holder of a sum of money for which two or more parties contend, to effectively decide the issue by selecting the one to whom the money is to be paid. As another court has stated,

> [s]urely a stakeholder, caught in the middle between two competing claimants, cannot, in effect, decide the merits of their claims by the mere physical act of delivering the stake to one of them.

*Newark Insurance Co. v. United States,* 169 F.Supp. 955, 957, 144 Ct.Cl. 655 (1959); *see Balboa Insurance Co. v. United States,* 775 F.2d 1158, 1161–63 (Fed.Cir. 1985) (quoting *Newark Insurance* ).

A procedural device—interpleader—exists to protect a party that, like USPS in this case, finds itself beset by competing claims to a sum of money that it holds. Here, USPS did not interplead any funds until after it had paid approximately $900,000 to the Sureties and to some of Brady's creditors,[7] although USPS was on notice of Active's claim. The payments left a mere $36,294 to be disposed of by the court by means of USPS's interpleader claim.

One might argue that because Active never sought an injunction preventing USPS from making any payments pending the disposition of this lawsuit it is effectively estopped from arguing that its position has eroded over time. This argument must fail. When USPS became aware of Active's claim, it was placed on notice of the possibility of a recovery against it. It also should have recognized the risk that it faced if it paid the money out to other parties. USPS cannot complain that Active did not try to prevent it from taking that risk.

We express no view on what might have happened if USPS had interpleaded the full amount it owed Brady as of the date this

---

7. See BACKGROUND Parts 3 and 4.

suit was commenced. The fact remains that USPS did not interplead the full amount it owed Brady. Nor do we express any view on whether any of the subcontractors who timely pursued their Miller Act claims against the payment bond might still be able to assert a claim against USPS, subject to the doctrine of laches, similar to Active's claim in this suit, but limited to any balance due them after receipt of their pro rata recoveries on the bond.

## CONCLUSION

We have carefully considered USPS's remaining arguments and have found them to lack merit. For the foregoing reasons, we reverse the district court's order insofar as it dismisses the claims of Active as against USPS based upon the Contract Balance held by USPS at the time the Lien Action was commenced.[8]

We note that we are without jurisdiction to review the order that remands this case to the state court. *See* 28 U.S.C. § 1447; *Waco v. United States Fidelity & Guaranty Co.*, 293 U.S. 140, 143, 55 S.Ct. 6, 7, 79 L.Ed. 244 (1934). Thus, it appears that we are limited to reversing the dismissal while leaving the "entire controversy," including Active's reinstated claim against USPS, subject to the remand order. *See id.* at 143–44, 55 S.Ct. at 7. In other words, if the case already has been remanded, all of Active's claims will be before the state court.[9] It appears, however, that the remand order may not have been put into effect since the district court docket sheet indicates that while a copy of the remand order was twice sent to the state court, it was returned by that court both times because no index number exists for the case in that court. We therefore remand this

action and invite the district court to reconsider the remand to the state court in light of this opinion in the event the district court determines that jurisdiction has not been effectively reacquired by the state court.

---

8. We are unaware of any other claims, pending or potential, against USPS based upon a similar equitable theory, and we express no view as to the effect any such claims by any other claimants might have on Active's recovery. For this reason, and because we seek to avoid duplicative proceedings, we do not instruct the district court to enter a partial judgment of $82,226.67, the "undisputed" amount, in favor of Active and against USPS and Brady.

Since USPS did not request reversal of the grant of summary judgment in favor of the Sureties as against USPS, and because the claim of the appellant has been determined on other grounds, we need not discuss the issue of whether USPS may be reimbursed by the Sureties.

9. If this is the case, we express no opinion as to whether the action may again be removed to the district court.