**In re ADL CONTRACTING CORPORATION,**
**Debtor.**

**Bankruptcy No. 93–B–20725.**

United States Bankruptcy Court, S.D. New York.

July 27, 1995.

As Corrected Aug. 9, 1995.

438

Law Office of Charles A Sherwood by Charles Sherwood, New Haven, CT, for F & W Welding Service Inc.

Lambert & Weiss by Richard Isgard, New York City, for Aetna Cas. and Sur. Co.

U.S. Atty. for the S.D. of N.Y. by Aimee Wolfson, New York City, for I.R.S.

Law Office of Jeffrey L. Sapir, by Gloria Herzig Indik, White Plains, NY, for ADL Contracting Corp.

### Decision Determining Entitlement to Funds Withheld Pending Completion Of A Construction Project

JOHN J. CONNELLY,* Bankruptcy Judge.

The question presented here is which of three creditors has priority to funds presently held in escrow by the attorney for the debtor, ADL Contracting Corporation ("ADL"). The escrowed funds represent the proceeds of a settlement of a breach of contract suit brought by ADL against the Town of Orange ("Town") over a construction project commenced in December 1986 ("the Project"). The first creditor, Aetna Casualty and Surety Company ("Aetna"), asserts entitlement to the proceeds as subrogee as a result of payments it made to various subcontractors of the debtor after ADL failed to complete the project. The second creditor, F & W Welding Service, Inc. ("F & W"), who leased certain equipment to ADL in connection with the project, argues that its judgment lien is superior to both Aetna's claim to the proceeds as well as the IRS's claim which is based upon a tax lien. The IRS, the third creditor, concedes that it does not have priority vís-a-vís Aetna, yet, asserts that its tax

* Sitting by Special Designation.

lien is superior to F & W's claim since its tax lien ripened prior to F & W's judgment lien. For the following reasons, I hold that F & W has the superior claim as an unpaid subcontractor under Connecticut law irrespective of its status as a judicial lien creditor.

## BACKGROUND

On December 12, 1986, ADL, as general contractor, entered into a contract worth approximately $2.1 million with the Town for the installation of sewer pipelines.[1] Under the terms of the contract, the Town was authorized to make progress payments and withhold a certain percentage of the amount due monthly, pending completion of the project ("retainage"). Approximately $80,000 was held by the Town at the time F & W was informed that the project would not be completed. (Sherwood Aff. ¶ 30). Apparently, ADL failed to complete one of its final obligations to resurface the area housing the newly installed sewer pipelines. *F & W Welding*, 217 Conn. at 510–11, 587 A.2d at 94–95. As a consequence, an independent subcontractor finished the last phase of the project and the Town ultimately ended up paying more-or-less the amounts budgeted for that job. *Id.* On December 21, 1988, the Town announced that the contract had been "substantially completed." *Id.* Thereafter, however, a dispute erupted between the debtor and the Town over some of the work performed and on April 14, 1989, ADL notified the Town that it would not complete the contract. *Id.*

Skipping ahead for the moment, ADL filed a suit against the Town of Orange for breach of contract in the United States District court in Connecticut. While the action was pending, an involuntary chapter 11 petition was filed against ADL on April 13, 1993. Judge Schwartzberg signed an Order for Relief on December 15, 1993. Shortly thereafter, ADL and the Town of Orange agreed to resolve the suit for $50,000. (Isgard Aff. ¶ 6). After the settlement was approved by the District Court, $32,781.54, the balance of the proceeds after legal fees, was deposited in escrow with ADL's counsel, Jeffrey Sapir. (Isgard Aff. ¶ 7).[2]

F & W's claim to the settlement funds arises from events related to ADL's performance of the project. As part of the project, ADL rented certain equipment from F & W Welding Service which was used in the construction of the pipelines. *F & W Welding*, 217 Conn. at 510, 587 A.2d at 94. Apparently, ADL failed to pay the rental fees for the equipment and F & W pursued and obtained from the Superior Court of Connecticut an order authorizing F & W to garnish the retainage. *Id.* Along with this pre-judgment remedy, F & W commenced a suit in the Superior Court to collect the amounts owed. *Id.* at 511, 587 A.2d at 95. The suit was ultimately settled, and on June 9, 1989, the court so ordered a stipulation for judgment in favor of F & W in the amount of $25,153.34. *Id.* Execution of the judgment issued on July 20, 1989 when demand was made; the demand remained unsatisfied when the Town refused to pay. *Id.*

Thereafter, F & W both filed a judgment lien upon the property of ADL in accordance with Connecticut law and commenced an action attempting to compel the turnover of the retainage held by the Town of Orange. *Id.* The Connecticut Superior Court determined that the garnishment was ineffective since the retainage had yet to become ADL's property. *F & W Welding*, 217 Conn. at 513, 587 A.2d at 95. The lower court's ruling was ultimately affirmed by the Connecticut Supreme Court on February 26, 1991. *Id.* at 515, 587 A.2d at 96.

Shortly thereafter, as part of the garnishment action, on August 21, 1989, F & W commenced an action in state court seeking a determination of priorities as to the retain-

---

**1.** The events which gave rise to this dispute have been fully chronicled in a decision resolving a state court action between two of the three contestants to the fund. *See F & W Welding Service, Inc. v. ADL Contracting Corporation*, 217 Conn. 507, 587 A.2d 92 (1991). As I will assume familiarity with that decision, I will limit the factual recitation here to the bare necessities.

**2.** Notwithstanding that ADL's counsel is currently holding the funds in escrow, the debtor has not claimed an interest in the funds. This concession eliminates the need for me to reach the issue of whether the retainage constitutes property of the debtor's estate.

age held by the Town. (Sherwood Aff. ¶ 16; Sherwood Aff. Ex. E). The following creditors were named as defendants: the IRS, Aetna, the Town of Orange, Barclay's Bank of New York and Codesponti Design. Only Aetna and the IRS responded as contestants. (Sherwood Aff. ¶¶ 17, 18). Barclay's Bank of New York and Codesponti did not assert a claim to the proceeds. (Sherwood Aff. ¶ 18). The trial court found that since there was no fund available, a hearing determining priorities was similarly premature. (Sherwood Aff. ¶ 23).

Upon the filing of the bankruptcy petition, and after the suit between ADL and Town was settled and the portion of the retainage escrowed, this motion was made by F & W for an order determining priority as to the proceeds.[3] F & W now asserts that its judgment lien is superior to Aetna's interest in the settlement funds because Aetna never completed the project as it contracted to do under the performance bond it issued. (F & W Mem. at 9–12). F & W also maintains that the retainage which was held by the Town of Orange at the time of the tax assessment was not ADL's "property" upon which the IRS's tax lien can attach. (F & W Mem. at 7–9).

Aetna's claim to the retainage flows from its issuance of a performance bond and a payment bond on the December 12, 1986 contract between the Town and ADL. (Isgard Aff. ¶ 2). As I just mentioned, Aetna chose not to complete the project as it had contracted to do under the performance bond, but instead paid a total of $175,022.26 to various subcontractors in satisfaction of its obligation under the payment bond. (Isgard Aff. ¶ 3; Sherwood Aff. ¶ 29). Aetna now argues that its claim to the retainage is superior to the other contestants under the case law of Connecticut.

The IRS's claim to the proceeds arises from a tax assessment made against ADL on May 6, 1989 for $113,678.38. (IRS's Mem. at 2; IRS's Ex. B). The IRS filed a Notice of Tax Lien with the Secretary of State of New York on May 30, 1989. (IRS's Mem. at 2). In a letter dated July 20, 1994, the IRS acknowledged that Aetna has priority over the IRS to the settlement proceeds. (Letter from IRS dated 7/20/94 at 1–2). However, as between F & W and the IRS, the IRS claims that its tax lien is superior to F & W's judgment lien. (IRS's Mem. at 2–5).

Shortly after my arrival in this district as a visiting judge, the parties appeared before me for oral argument on July 13, 1994 at the end of which I asked the parties to file shortly thereafter any memoranda which they wished me to consider in rendering my decision. At that hearing I heard arguments which surprisingly, neither side had raised in the written submissions which preceded the motion or even in submissions filed subsequent to the hearing. To be clear, F & W has not argued in any of its written submissions that it is entitled to share *pari passu* with Aetna or that it has equitable rights under Connecticut law which are superior to those of Aetna. Instead, its written submissions rely solely on its rights to the retainage as a judicial lien creditor. (F & W Mem at 6–7). Likewise, Aetna's written submissions failed to address either of these two possibilities. It was only at oral argument that counsel for F & W first surmised (in response to an argument raised by counsel for Aetna) that F & W had a superior equitable right to the retainage as an unpaid materialman. In response to this "new" argument, counsel for Aetna back-pedalled and urged that at a minimum his client was entitled to receive an amount in the vicinity of eighty-eight percent of the retainage (which figure he calculated assuming a *pro rata* distribution).

## DISCUSSION

A. *Performance and Payment Bonds Generally*

When a surety issues a performance bond, the surety guarantees to the

---

**3.** I would note that the requested relief is properly obtained by commencing an adversary proceeding. An adversary proceeding is brought in order to "determine the validity, priority, or extent of a lien or other interest in property...." *see* Federal Rules of Bankruptcy Procedure 7001(2). So as not to further delay this matter, I will allow F & W to proceed by motion since no objection to my doing so was interposed by any of the parties. *See In re Wild Lilly, Inc.,* 51 B.R. 963 (Bankr.S.D.N.Y.1985).

owner that the project will be completed at a certain price irrespective of whether the contractor is able to complete the project. *See Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 140, 83 S.Ct. 232, 236, 9 L.Ed.2d 190 (1962); *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir.), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968) (quoting *United States v. Munsey Trust Co.*, 332 U.S. 234, 244, 67 S.Ct. 1599, 1604, 91 L.Ed. 2022 (1947)); *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843, 845 (1st Cir.1969) (discussing the business considerations of construction bond insurance). In contrast, a payment bond is an agreement whereby the surety agrees to pay those who furnish labor or materials to a project upon default by the contractor. *See Pearlman*, 371 U.S. at 140, 83 S.Ct. at 236; *see also* 40 U.S.C. 270(a) (Statute requiring contractors to obtain a performance bond and a payment bond on all government contracts exceeding $25,000). Underlying these two bonds is the premise that "[i]f the contractor defaults, the surety performs the work, mitigates loss by its performance, and pays the subcontractors and suppliers." *First Indemnity of America v. Modular Structures, Inc (In re Modular Structures, Inc.)*, 27 F.3d 72, 74 n. 1 (3rd Cir.1994).

■ Courts dating back to the era of the civil law have recognized the social good that is furthered when sureties discharge obligations that exist upon the default of the general contractor. *Pearlman*, 371 U.S. at 137, 83 S.Ct. at 235 (citing *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 7 S.Ct. 482, 30 L.Ed. 595 (1887) (The right of subrogation is a creature of equity, and "is enforced solely for the purpose of accomplishing the ends of substantial justice")); *Prairie State Nat. Bank of Chicago v. United States*, 164 U.S. 227, 231, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896) (quoting *Aetna L. Ins. Co. v. Middleport*, 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537 (1888)) (internal quotations omitted) ("the

doctrine of subrogation is a pure unmixed equity, having its foundation in the principles of natural justice ..."). In this spirit, the case law has firmly established that once a surety satisfies its obligation under either of the bonds, the surety accedes by the equitable doctrine of subrogation to the rights of the party whose rights were satisfied by its performance under the particular bond. *United States v. California and California State Bd. of Equalization*, —— U.S. ——, 113 S.Ct. 1784, 123 L.Ed.2d 528 (1993) (citing *Munsey Trust*, 332 U.S. at 242, 67 S.Ct. at 1603; *Pearlman*, 371 U.S. at 136–37, 83 S.Ct. at 234–35 (citations omitted) ("[p]robably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.") Specifically,

> [t]he surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of the laborers and materialmen who have been paid by the surety—who may have had liens; and not least, in the shoes of the government [owner] for whom the job was completed.

*Shawmut Bank*, 411 F.2d at 845; accord *Modular Structures*, 27 F.3d at 74 n. 1; *In re Dutcher Construction Corporation*, 298 F.2d 655, 656 (2d Cir.1962) (upon satisfaction of the obligations under a payment bond, a surety steps into the shoes of the laborers and materialmen whom it paid and is entitled to "enjoy any priority that creditor enjoyed."), *aff'd sub nom. Pearlman*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190; *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir.), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968) (discussing the rights that arise upon the discharge of obligations under a performance bond.)[4]

---

4. In that case, the Fifth Circuit Court of Appeals wrote: "A different situation occurs when the surety completes the performance of a contract. The surety is not only a subrogee of the contractor, and therefore a creditor, but also a subrogee of the government [owner] and entitled to any rights the [owner] has to the retained funds. If the contractor fails to complete the job, the [owner] can apply the retained funds and any remaining progress money to costs of completing the job.... On the other hand, the surety may undertake to complete the job itself. In so doing, it

Moreover, to the extent the original creditors are vested with a priority to funds withheld until completion of the construction contract, sureties who perform under either of the bonds are deemed to acquire an "equitable lien" against those funds. *See Pearlman*, 371 U.S. at 136, 83 S.Ct. at 234 (a surety, upon satisfying its obligation under the payment bond, becomes "either the outright legal or equitable owner of the [retainage] fund, or had an equitable lien or prior right to it."); *Mickelson v. Aetna Casualty and Surety Company*, 452 F.2d 1219, 1222–24 (8th Cir.1971); *Shawmut Bank*, 411 F.2d at 843 ("Any retainage payments that are earned but unpaid to the general contractor, become an asset upon which the surety can satisfy its claim."); *Balboa Insurance Co. v. Bank of Boston Connecticut*, 702 F.Supp. 34, 37 (D.Conn.1988) (citations omitted); *Home Indemnity Company v. United States of America*, 313 F.Supp. 212, 215–16 (W.D.Mi. 1970) (quoting *Glenn v. American Surety Company*, 160 F.2d 977 (6th Cir.1947)); *American Fidelity Co. v. Delaney*, 114 F.Supp. 702 (D.Vt.1953). This "equitable lien" or "prior right" to the fund relates back to the date of the surety contract and is superior to any lien arising thereafter. *Prairie*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; *Henningsen v. United States Fidelity & Guarantee Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *Employers' Liability Assurance Corporation, Ltd. v. Crandall*, 22 Conn.Supp. 404, 173 A.2d 926 (Conn.C.P. 1961); *But see Munsey Trust*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed.2022 (recognizing that the government's right to a setoff based on sums due from the contractor on other jobs is superior to any claim of the surety by way of subrogation); *Active Fire Sprinkler v. United States*, 811 F.2d 747, 756 (2d Cir. 1987) (recognizing that claims based on subrogation do not trump those of unpaid subcontractors).

## B. *The Procedural Arguments*

Armed with these principles, I turn to the pending dispute. Before I reach the merits,

however, I must dispose of two threshold objections which F & W raises. Specifically, F & W asks me to render a decision favorable to them by invoking either the equitable doctrine of estoppel or laches. I decline to do so since I do not believe the circumstances here warrant the granting of such equitable relief.

I am unpersuaded by F & W's contention that Aetna should be "estopped" from making any claims against the proceeds because of its decision not to complete the project. This decision, F & W baldly asserts, negated the possibility of generating additional funds which in turn would have allowed for the payment of both Aetna's and F & W's claims. Thus, F & W concludes, an injustice would result if I allow Aetna to be reimbursed for the payments it made under the payment bond. I do not agree.

To allow the relief requested, the record must (and it does not) contain evidence of (1) a material misrepresentation, (2) [reasonable reliance] and (3) damage. *Petrelli v. City of Mount Vernon*, 9 F.3d 250, 256 (2d Cir.1993) (quotations omitted). I do not find the record that F & W has put forth here, even supplemented by the facts articulated in the state court decision of which I took judicial notice, supports the application of such a remedy. More importantly, however, the unique array of subrogation rights previously discussed has been recognized to exist even if upon the default of a contractor, the surety chooses not to complete the contract under the performance bond, but rather to make payment under the payment bond. *Pearlman*, 371 U.S. at 139, 83 S.Ct. at 236 ("[T]he same equitable rules as to subrogation and property interests in a retained fund ... exist whether a surety completes a contract or whether ... it pays the laborers and materialmen.") Therefore, Aetna's choice to pay rather than complete performance provides no basis to invoke the equitable doctrine of estoppel.

performs a benefit for the [owner], and has a right to the retained funds and remaining progress money to defray its costs. The surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the [owner]."

▮ I am also unpersuaded by F & W's argument that I should invoke the equitable doctrine of laches since Aetna allegedly first asserted its claim some eight years after the issuance of the payment bond. Laches is an equitable remedy which bars a claim if a plaintiff fails to exercise due diligence in prosecuting a claim. *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 65 (2d Cir.1983); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Investments, Inc.)*, 162 B.R. 426, 438 (Bankr.S.D.N.Y.1993). F & W's contention makes no sense since although Aetna's right of subrogation relates back to the time of the surety contract, Aetna's claim arose at the time it became entitled to the settlement fund proceeds; i.e. when it paid the laborers and materialmen. *See Pearlman*, 371 U.S. at 141, 83 S.Ct. at 237. Nonetheless, in order to succeed, F & W must have pointed to facts other than the mere passage of time that would warrant the imposition of such a doctrine. *Hooker Investments*, 162 B.R. at 438. F & W bore the burden (which it has not sustained) of establishing an undue prejudice or injustice caused by the passage of such time and that Aetna's conduct is responsible for the damage it suffers. In sum, nothing before me suggests that I should invoke the equitable doctrine of laches.

C. *The Merits: F & W As A Judicial Lien Creditor*

▮ That said, I turn first to the question of whether the rights to the retainage of F & W as a judicial lien creditor are superior to the rights of Aetna as subrogee to the original laborers and materialmen. As I previously indicated neither side addressed in writing the issue of whether F & W as a lessor of equipment has a superior equitable claim to the fund as an unpaid subcontractor or materialman. Nonetheless, the parties argued this very issue at oral argument and I consider the issue to be submitted and not waived. Accordingly, I will start first with the order of priority to the funds assuming F & W's status is a judicial lien creditor and deal thereafter with the order of priority assuming F & W's status as an unpaid subcontractor.

▮ To decide whether F & W as judicial lien creditor holds a greater right to the retainage than does Aetna as subrogee to the claims of laborers and materialmen, I look to Connecticut law which governs this matter. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979); *Owens v. Drywall and Acoustical Supply Corp.*, 325 F.Supp. 397, 399 (S.D.Tex.1971) (citations omitted) ("The determination of property rights is a question to be decided under state law.") The case law in Connecticut recognizes that laborers and materialmen have an original and continuing equitable priority in a retained fund which is superior to the rights of a creditor who obtained a judicial lien after the commencement of a construction project. *Royal School Laboratories, Inc. v. Town of Watertown*, 358 F.2d 813, 816–17 (2d Cir.1966); *Balboa*, 702 F.Supp. at 37–38; *accord In re Dutcher Construction Corporation*, 298 F.2d 655, 656 (2d Cir.1962), *aff'd sub nom Pearlman*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (recognizing that laborers and materialmen have an equitable priority to retained funds under Federal Law); Art. 3–A N.Y. Lien Law § 70(1)–(3) (McKinney 1966) (statute deeming funds of a contract for the improvement of real property or for a public improvement to be assets of a trust whose purpose is the payment of claims of subcontractors, laborers and materialmen.)

For example, in *Balboa*, the District Court, applying Connecticut law, concluded that a surety's claim that arose pursuant to a payment bond on a public construction contract primed the claim of a judicial lien creditor. *Id.* at 38. While that Court bottomed its decision on an analysis of the caselaw in other jurisdictions; the Court also recognized in passing that Conn.Gen.Stat. § 49–41 requires the posting of a $25,000 surety bond as a prerequisite to a public contract. *Id.* at 37–38. The Court concluded that "this statutory requirement was designed to protect laborers and materialmen who are employed to work on public projects." *Id.* at 37 (citing *American Masons' Supply Co. v. F.W.*

*Brown Co.*, 174 Conn. 219, 384 A.2d 378 (1978)).[5]

Balboa's interpretation of Connecticut law mirrors the Second Circuit's interpretation in *Town of Watertown* where Judge Friendly wrote:

The Connecticut surety statute itself, Conn.Gen.Stat. 49–41, manifests a legislative solicitude for materialmen and a public policy that those who contribute labor and material under a public contract should be compensated for their services. *See Pelton & King, Inc. v. Town of Bethlehem*, 109 Conn. 547, 147 S.[A.] 144, 147 (1929); *International Harvester Co. v. L.G. DeFelice and Son, Inc.*, 151 Conn. 325, 333, 197 A.2d 638, 643 (1964). The equitable right of unpaid materialmen to sums due under a contract for a public improvement was recognized in *Employers' Liab. Assur. Corp. v. Crandall*, 22 Conn.Sup. 404, 173 A.2d 926 (C.P.1961), where a surety which had paid for work and material was held entitled, as against garnishers of the contractor, to the unpaid balance in the hands of the town. The surety's priority, which it could assert only by subrogation to the claims it had discharged, was necessarily based on the rights and preferences of such suppliers as to sums due or to become due under the contract.' 173 A.2d at 927. That such rights and preferences of a materialmen over a contractor or his assignee would in all likelihood be upheld by the Connecticut Supreme Court is further suggested by its declaration that the state's surety statute was intended to operate in conformity with the federal Miller Act, 40 U.S.C. 270(a)–270(d). *International Harvester Co. v. L.G. DeFelice and Son, Inc.*, 151 Conn. 325, 333, 197 A.2d 638, 643 (1964). Under that statute and its predecessor, the Heard Act, 28 Stat. 278, the federal courts have traditionally recognized the materialman's equitable priority to a withheld fund. *See Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908);

*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). 358 F.2d at 816–817. Not only is the Circuit's interpretation of Connecticut law binding on me, but I find it, along with the decision in *Balboa*, to be the correct result in that it is consistent with the long standing tradition of courts employing rules of law that protect the rights of laborers and materialmen. *See Munsey Trust*, 332 U.S. at 240, 67 S.Ct. at 1602 ("From *Prairie State Nat. Bank v. United States*, 164 U.S. 227, 41 L.Ed. 412, 17 S.Ct. 57 [142] [ (1896) ] to *American Surety Company v. Sampsell*, 327 U.S. 269 [66 S.Ct. 571, 90 L.Ed. 663 (1946) ], we have recognized the peculiarly equitable claim of those responsible for the physical completion of building contracts to be paid from available moneys ahead of others whose claims come from the advance of money.")

In sum, the case law in Connecticut does not offer any special protection to F & W as a judicial lien creditor which would permit it to trump the equitable rights of a surety as subrogee to laborers and materialmen. I am not persuaded otherwise by F & W's contention that because the laborers and employees could not assert a lien on the property of the Town of Orange, Aetna could not accede to a position superior to its judgment lien. This argument is strikingly similar to the argument adopted by the Supreme Court in *Munsey* and later rejected in *Pearlman*. 371 U.S. at 141, 83 S.Ct. at 237 ("We hold that *Munsey* left the rule in *Prairie Bank* and *Henningsen* undisturbed. We cannot say that such a firmly established rule was so casually overruled.") After disposing of that same argument now asserted by F & W, the High Court further ruled:

in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen: that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become enti-

**5.** In *American Masons*, the Supreme Court of Connecticut held "[t]he statutory requirement of a bond is designed to 'protect and benefit those who furnish materials and labor to the contractor on public work, in that they may be sure of payment of their just claims, without defeat or undue delay; *Pelton & King Inc. v. Bethlehem*, 109 Conn. 547, 556, 147 A. 144, 147; and such statutory provision is to be liberally construed." *Id.* at 227, 384 A.2d 378.

tled to the fund; and that the surety, having paid the laborers and materialmen is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it. *Id.* In light of the Second Circuit's decree in *Town of Watertown* that the Connecticut surety laws are intended to operate in conformity with its federal counterpart, the Supreme Court's holding in *Pearlman* is fatal to F & W's argument that it has superior rights to the fund as a judicial lien creditor.

### D. *The Merits: F & W As An Unpaid Subcontractor*

■■■■■ Before I start the second part of the analysis I feel compelled to note that the delay in rendering this decision is primarily attributable to the fact that the briefs supplied by the parties were in many areas incomplete. Conspicuous by its absence is that none of the parties addressed the pivotal fact that F & W would appear, even at first blush, to be both a judicial lien creditor and a unpaid subcontractor/materialman within the definition of Connecticut's surety law. *See* Conn.Gen.Stat. 49–42(c) ("The word 'material' as used in sections 49–41 [the statute which requires the furnishing of a bond on construction projects] ... includes the rental of equipment used in the prosecution of work provided for in the contract."); *International Harvester Company v. DeFelice and Son, Inc.,* 151 Conn. 325, 197 A.2d 638 (1964) (citations omitted) ("To meet the objective of the statute, material actually forming a part of the public work, labor performed at the site, and, under the express wording of our statute, the renting of equipment used in the prosecution of the work are clearly covered.") *accord* Art. 1 N.Y.Lien Law § 2(12). While this omission may be related to the fact that F & W can no longer assert a claim against the payment bond, *see* Conn.Gen.Stat 49–42(b) (Connecticut's Surety Statute has a one year statute of limitations), the fact that F & W is barred from seeking payment from Aetna does not defeat any equitable claim which it has against the retainage. *See Active Fire,* 811 F.2d at 757 (where the Second Circuit employed, arguably in dicta, New York's six year statute of limitations for contract actions to proceedings involving withheld funds).

■■■■ That said, I find that F & W has a superior claim to the retainage as an unpaid subcontractor than does Aetna as a subrogee to the rights of the paid subcontracts. This conclusion is mandated by the decision in *Active Fire* where the Second Circuit held:

> [a] surety on a payment bond for the protection of subcontractors on a construction bond may share in the unpaid balance of the contract, subject to the satisfaction of the subcontractors' claim in full. This is true even if the surety has paid the full sum of the bond. Thus, although the Sureties are subrogated to the claims of any subcontractors whose claims they have paid, their claims are *inferior* to those of any remaining unpaid subcontractors.

811 F.2d at 756 (emphasis supplied). I also find that F & W, as an unpaid subcontractor, has a superior right to the retainage than does the IRS. While I accept the IRS's argument that its claim primes that of F & W as judicial lien creditor, that is not the issue in light of my finding that F & W continues to have equitable rights as an unpaid subcontractor. The case authority previously cited is clear that the claim of an unpaid subcontractor to the retainage is paramount to those of virtually all other claimants including tax liens. Indeed, the IRS's concession that its rights are subordinate to the equitable rights of Aetna as subrogee to the paid subcontractors suggests as much. While I am loathe to hoist the IRS by its own petard, I do so confident that the IRS would have yielded this point had the matter been properly presented.

### CONCLUSION

Accordingly, I find that Aetna, by virtue of its equitable right to subrogation, has acquired an equitable lien or prior right to the amount it paid to the laborers and materialmen under the payment bond it issued on December 12, 1986. This equitable lien is superior in right to F & W's judgment lien and the IRS's tax lien but is inferior to F & W's claim to the fund as an unpaid subcon-

tractor. Consequently, Debtor's counsel is directed to transfer $30,542.36 (the amount of the judgment plus pre-petition interest) of the funds held in escrow to F & W and the balance of the funds to Aetna. Both parties are directed to amend (or withdraw) their proof of claims upon receipt of the proceeds.

SETTLE ORDER consistent with this decision.