**In re QC PIPING INSTALLATIONS, INC., Debtor.**

**Allan B. MENDELSOHN, Chapter 7 Trustee of the Estate of QC Piping Installations, Inc., Plaintiff,**

**v.**

**The DORMITORY AUTHORITY OF THE STATE OF NEW YORK and International Fidelity Insurance Company, Defendants.**

Bankruptcy No. 093–71758–511.

Adversary No. 095–7115–511.

United States Bankruptcy Court, E.D. New York.

Sept. 28, 1998.

Sills Cummis Zuckerman Radin Tischman Epstein & Gross, New York City, by Patricia Fugee, for International Fidelity Insurance Co.

Plunkett & Jaffe, P.C., New York City, by Arthur J. Semetis, for Dormitory Authority of the State of New York.

Pryor & Mandelup, LLP, Westbury, New York, by Jeanne M. Farnan, for Trustee.

### OPINION (Motion for Summary Judgment)

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

QC Piping Installations, Inc. ("QC" or "Debtor") filed a voluntary petition for relief

under chapter 7 on June 1, 1993. Allan B. Mendelsohn, Esq. ("Trustee") was appointed as permanent trustee on July 20, 1993.[1] On July 18, 1995, the Trustee filed the present adversary proceeding against the Dormitory Authority of the State of New York ("DAS-NY") and International Fidelity Insurance Company ("IFIC"). Before the Court is a motion for summary judgment by IFIC, in which DASNY has joined. At issue on this motion are the competing claims of the Trustee and the Debtor's surety, IFIC, to money retained by DASNY in connection with its pre-petition construction contract with the Debtor.

*Factual Background*

The following facts are undisputed, except where noted. Prior to the filing, DASNY solicited bids for construction work at the City University of New York, Baruch College. QC bid for and was awarded the contract. In connection with the construction project, IFIC issued a performance bond for the benefit of DASNY in which it agreed to complete the work if QC defaulted.[2] IFIC also issued a labor and material bond for DASNY's benefit in which it agreed to pay the claims of laborers and materialmen if QC defaulted.[3] *See Certification of Bogda Clarke, Esq., Vice President and Claims Counsel of IFIC ("Clarke Cert."), ¶¶ 3 & 4.*

The May 31, 1991 contract between DAS-NY and QC was executed on QC's behalf by Jerome F. Kennedy ("Kennedy"), QC's President. The signed document, which is labeled "Contract," states:

1. The Contractor shall Furnish and shall perform all Work of every kind or nature whatsoever required and all other things necessary to complete in a proper and workmanlike manner the Fire Protection Work at CUNY—Baruch College—Site "A" Contract # 5—DA # 6500 180 1 2129 in strict accordance with the Contract Documents (of which a listing of specifications and drawings are attached hereto) and in strict accordance with such changes as are ordered and approved pursuant to the Contract. . . .

*See Exh. A to Clarke Cert.* The document contains, in addition to the preamble and the first paragraph quoted above, three more brief, numbered paragraphs. Paragraph 2 essentially provides that QC agreed to perform all the work and labor required by the contract for the sum of $945,545. Paragraph 3 provides that the work was to be completed on or before October 25, 1993, and that QC was required to pay DASNY $300 per day for each day thereafter that the work was not done. Paragraph 4 identifies DASNY as both the owner of the land and the owner of the building, and gives the street address of the property where the work was to be done.

The phrase "Contract Documents," contained in the first paragraph quoted above, is not defined by the document labeled "Contract." IFIC contends, but the Trustee disputes, that DASNY's contract with QC consists of several documents including, but not limited to, the May 31, 1991 document labeled "Contract" (referred to above), a Form of Bid dated April 16, 1991 and executed by Kennedy, and a document entitled "General Conditions for City University Projects" ("General Conditions") which is not executed by either party. *See Exh. B to Clarke Cert.* The Trustee does not dispute that the General Conditions document is a detailed, 45-page document with twenty numbered articles.[4] Nor does he allege any ambiguity in any of

---

1. *See* 11 U.S.C. §§ 322 and 702(d).

2. A performance bond guarantees to the construction project owner that the construction project will be completed at a certain price, even if the contractor is unable to complete the work. *In re ADL Contracting Corp.,* 184 B.R. 436 (Bankr.S.D.N.Y.1995).

3. A labor and material payment bond binds the surety to pay, upon the default of the contractor, the unpaid claims of those who furnish labor and materials to the project. *ADL Contracting Corp., supra,* 184 B.R. at 441.

4. The articles contained in the General Conditions govern Definitions, Contract Documents, Interpretation of Contract Documents, Materials and Labor, Contractor, Inspection and Acceptance, Changes in Work, Time of Completion, Termination, Disputes, Subcontracts, Coordination and Cooperation, Protection of Rights, Persons and Property, Insurance and Contract Security, Use or Occupancy Prior to Acceptance by Owner, Payment, Tax Exemption, Guarantee, Standard Provisions, and Affirmative Action.

its terms. Rather, he contends that IFIC and DASNY have not shown that its terms apply.

Article 1, Section 1.01 of the General Conditions contains, *inter alia,* the following definitions:

Contract

> The agreement between the Owner and the Contractor consisting of the Contract Documents.

* * *

Contract Documents

> The Contract, Notice to Bidders, Information for Bidders, Form of Bid, General Conditions, Supplemental General Conditions, General Requirements, Bonds, Drawings, Specifications, Addenda, Change Orders, and any supplementary data together with all provisions of law deemed to be inserted in the Contract.

Article 9 of the General Conditions (governing "Termination"), Section 9.03, entitled "Owner's Right to Do Work," provides:

> The Owner may, after notice to the Contractor, without terminating the Contract and without prejudice to any other right or remedy the Owner may have, perform or have performed by others all of the Work or any part thereof and may deduct the cost thereof from any moneys due or to become due the Contractor.

Article 16 of the General Conditions (governing "Payment"), Section 16.06, entitled "Withholding of Payments," states:

> A. The Owner may withhold from the Contractor any part of any payment as may, in the judgement [sic] of the Owner, be necessary:

> 1. to assure payment of just claims of any persons supplying labor or materials for the work;

> 2. to protect the Owner from loss due to defective Work not remedied; or

> 3. to protect the Owner from loss due to injury to person or damage to the Work or property of other Contractors, Subcontractors or others caused by the act or neglect of the Contractor or Subcontractors. The Owner shall have the right to apply any said amount so withheld, in said manner, as the Owner may deem proper to satisfy said claims or to secure said protection. Said application of the money shall be deemed payments for the account of the Contractor.

In connection with QC's bid, Kennedy also signed, on behalf of QC, a document entitled "Commitment to Affirmative Action to Ensure Minority and Minority and Women Business Enterprises Opportunity." That document provides that the bidder (QC) agreed to "comply with the reporting requirements of Article 20 of the General Conditions." *See Supplemental Cert. of Stephan Boiko in Further Supp. of the Mot. of International Fidelity Ins. Co. and the Dormitory Auth. of the State of New York to Dismiss the Adversary Proceeding,* dated Feb. 15, 1996 (*"Supp. Boiko Cert."*), at 3, ¶ 6; Exh. C.

QC began performance of the DASNY contract and, during the construction, DASNY made certain payments to QC when QC submitted payment requisitions for work it had completed. DASNY held back, as "retainage," five percent of the payments to QC.[5] In May of 1993, QC defaulted on its contract with DASNY, and DASNY terminated the contract.[6] Pursuant to its bonds, IFIC was

---

5. The Court notes that the document entitled "Contract" makes no reference to either monthly progress payments or retainage. The only provisions referring to either monthly payments or retainage are found in the General Conditions. Section 16.01 provides that the "Owner may make a partial payment to the Contractor on the basis of an approved estimate of the Work performed during each preceding business month. The Owner shall retain five percent (5%) of the amount of each said estimate...."

6. The Trustee, in his *Objection to Motion of International Fidelity Insurance Company to Dismiss the Adversary Complaint, and a Further Obj. to the Joinder of the Dormitory Authority* dated Jan. 11, 1996 (*"Trustee Obj."*), asserts that neither IFIC nor DASNY have proved the date of default or identified whether it occurred pre- or post-petition. In response, DASNY submitted the *Supp. Boiko Cert.,* to which are annexed letters from DASNY to QC dated May 10, 1993, giving notice of DASNY's intention to terminate the contract, and dated May 12, 1993, terminating the contract effective May 11, 1993, under provi-

required 'to, and did, complete the construction and pay the claims of QC's laborers and materialmen, expending the total sum of $661,714.66.[7]

DASNY currently holds the sum of $42,913.61, representing the retainage on its contract with QC; this is what the Trustee's complaint seeks to recover.

*Procedural Background*

The Trustee's complaint alleges the existence of the May 31, 1991 contract with DASNY, and avers that during the completion of the contract, the Debtor submitted payment requisitions to DASNY on a monthly basis, and that DASNY paid the amounts requested in the requisitions, but that, pursuant to the contract, DASNY withheld 5% as retainage. The Trustee further avers that the last payment from DASNY to QC was made on April 5, 1995, and the payment requisition listed $42,913.61 as retainage due to QC as of that date. DASNY approved the last payment requisition on April 6, 1995.

The Trustee's first claim alleges that DASNY and IFIC are indebted to QC in an amount not less than $42,913.61, no part of which has been paid despite due demand. It alleges that the indebtedness is property of the estate and is a mature debt, payable on demand and/or payable on order to or on the order of the Trustee. It seeks judgment against the defendants, jointly and severally, ordering them to pay at least that sum plus interest to the Trustee and to account to the Trustee for all monies due to or being held on behalf of the Debtor. The Trustee's second claim contains all of the same allegations as the first and seeks recovery pursuant to 11 U.S.C. §§ 542(a) and (b). The third claim alleges that "all or part of the Indebtedness may have been transferred to or for the benefit of the Defendants as creditors of the Estate, for or on account of an antecedent debt owed by the Debtor ("Antecedent

Debt"), made while the Debtor was insolvent, or [sic] within 90 days of the date of the filing of the petition." It further alleges that the transfer would have enabled the Defendants to receive more than each or both would have if the transfer had not been made, and that the transfer therefore constitutes a preferential transfer avoidable by the Trustee. It seeks a declaration that the transfer is a voidable preference and an Order directing defendants to return to the estate the amount which constitutes the preferential transfer.

On December 1, 1995, IFIC moved to dismiss the Trustee's complaint for failure to state a claim upon which relief may be granted, supported by the certification of Bogda Clarke (Vice President and Claims Counsel of IFIC) and various documentary exhibits. Shortly thereafter, DASNY filed a "Notice of Joinder in Motion by the Dormitory Authority of the State of New York to Dismiss the Adversary Proceeding," supported by the affidavit of Stephan Boiko, Associate General Counsel of DASNY, dated Dec. 14, 1995 (*"Boiko Aff."*). The Boiko Affidavit alleges that DASNY is not an agency of the State of New York; rather, it is a public benefit corporation created by the Public Authorities Law of the State of New York. It further alleges that the Debtor's performance under the contract was terminated by DASNY on or about May 11, 1993, when the Debtor was defaulted for abandoning the contract. Upon the termination, DASNY made demand upon IFIC to complete the contract under the performance bond. It also states that DASNY is willing to pay the retainage to IFIC since "IFIC has completed the work and there are no other known claims against these monies." *Boiko Aff.* ¶ 7.

The Trustee filed an "Objection" to IFIC's motion (and to DASNY's joinder in the motion). Thereafter, counsel for IFIC filed the

---

sions of the General Conditions. In addition, IFIC's *Statement Pursuant to Local Rule 22(b) of Material Facts as to Which No Genuine Issue Exists to be Tried ("22(b) Statement")*, ¶¶ 10 and 11, states that QC defaulted on or about May 5, 1993, and DASNY terminated the contract five days later. The Trustee has not disputed those factual allegations in response, and has not submitted any evidence to contradict that offered by

IFIC. Accordingly, the Court deems the date of default, which occurred pre-petition, to be undisputed.

7. IFIC paid $58,326.61 to payment bond claimants, $510,779.26 to a completion contractor, and $92,608.79 to attorneys and consultants. *See IFIC's 22(b) Statement,* ¶ 15.

"Certification of Patricia B. Fugee, Esq. in Support of the Motion of International Fidelity Insurance Company to Dismiss the Adversary Proceeding," to which was attached a letter dated May 12, 1993 from DASNY to QC, which states: "The Dormitory Authority hereby terminates Q.C. Piping Installation Contract effective May 11, 1993."

At the initial hearing on IFIC's motion, the Court noted that IFIC was clearly relying upon matters outside the pleadings in support of its motion. Therefore, the Court notified all parties that it would treat the motion as one for summary judgment, gave each a reasonable opportunity to present all pertinent materials,[8] and directed each to comply with Rule 22(b) of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York.[9]

In response, the parties filed supplemental papers and statements pursuant to Local Rule 22(b). IFIC's Rule 22(b) Statement contains 17 numbered paragraphs, each containing a specific factual allegation. The Trustee's counter-statement consists of 4 paragraphs, and reads in its entirety as follows:

1. The Estate of the Debtor is entitled to any and all retainages withheld by the Dormitory Authority of the State of New York ("DASNY"), pursuant to the Contract between DASNY and the Debtor, as such retainages constitute property of the Estate.

2. The form of bid and Contract executed by Jerome F. Kennedy, as President of the Debtor, with the Dormitory Authority, annexed as Exhibit "A" to the certification of Bogda M.B. Clarke, Esq., does not include the General Conditions for City University Projects ("General Conditions").

3. Thus, the General Conditions including any provisions therein regarding entitlement to retained funds in case of default, are not binding on the Estate of the Debtor.

4. Unknown claimants may have a higher and better claim to any or all retainages than either the DASNY or International Fidelity Insurance Company.

The Trustee's 22(b) Statement does not controvert the specific facts alleged in IFIC's 22(b) Statement; rather, the Trustee's Statement essentially addresses legal conclusions. The Trustee did not submit any affidavits or documentary evidence in opposition to the motion.

*The Arguments of the Parties*

IFIC argues that under the contract between DASNY and QC, DASNY had the right to use the retainage to complete the construction work and pay laborers and materialmen. Specifically, IFIC points out that Sections 9.03 and 16.06 of the General Conditions allow (i) DASNY to deduct the cost of any work performed by others from any moneys due or to become due to QC, and (ii) permit DASNY to withhold "any part of any payment as may, in the judgment of the Owner, be necessary ... to assure payment of just claims of any persons supplying labor or materials for the Work...." It argues that, as the surety which stepped in and completed the work after QC's default, it is entitled to be subrogated to DASNY's rights under the contract. It also urges that its equitable right to subrogation arose at the

---

8. *See* Fed.R.Civ.P. 12(b), which provides that "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

9. At the time of the motion, Local Rule 22(b) provided:

Upon any motion for summary judgment, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. Local Rule 22(b) has since been replaced by E.D.N.Y. LBR 7056–1, which is substantially and substantively the same.

time the bonds were issued, long before the Trustee acquired any interest in QC's assets, and became enforceable when it carried out its obligations. Therefore, under principles of subrogation, IFIC contends that it assumes the right of the owner to use the funds to complete the job, assumes the rights of laborers to payment, and assumes any interest which the debtor/contractor may have had in the funds. For these reasons, IFIC argues that under New York law, it has the right to the retainage to the exclusion of QC—and now, QC's Trustee—and that the effect of subrogation is to remove the retained funds from the bankruptcy estate. In brief, IFIC asserts that the chapter 7 trustee, which can acquire no greater rights in the retainage than QC had, acquired no interest in the retainage. Since the Trustee's complaint is entirely premised upon the assumption that the retainage is property of the estate, IFIC urges that the complaint must fail.

The Trustee counters that the retainage is property of QC's estate. The Trustee asserts that "[t]here is no case, in New York or elsewhere, wherein a Court has found that under the Bankruptcy Code, retainage held by a contractor, and earned by the debtor, is not property of the Estate as a matter of law." See Trustee's Obj., ¶ 15, at 6. The Trustee claims that there may be other claimants with a higher or better claim to the retainage than IFIC and yet, IFIC has not shown, factually, that such claimants do not exist. In addition, the Trustee argues that in order to consider whether the retainage is property of QC's estate, the Court must make a factual determination as to whether the Debtor has a right to the retainage. He contends that the factual evidence supplied by IFIC and DASNY is not sufficient to establish, as a matter of law, that QC has no claim to the fund. Although the Trustee recognizes that IFIC claims that the General Conditions allow the project owner to complete the project and to use the retainage for completion costs, the Trustee contends that there is an issue of fact as to the application of the General Conditions. Among other

things, he observes that "these purported General Conditions have not been executed by the Debtor or any of its principals or officers. IFIC and the DASNY have not shown that the Debtor in any way accepted or ratified these General Conditions. Neither IFI nor the DASNY has proven that the General Conditions are binding upon the Trustee of the Debtor." Trustee Obj., ¶ 23. He points out that the May 31, 1991 contract does not mention the General Conditions, and "[n]owhere in the purported Contract documents is there an acknowledgment by the Debtor, or any of its officers or principals, that the Debtor was in any way bound by the terms of the General Conditions." Because, according to the Trustee, IFIC has failed to show that the General Conditions apply, he asserts that there is an insufficient factual showing that DASNY has the contractual right "to utilize unpaid sums to complete the project or pay laborers or materialmen, since IFIC has not established that the Debtor was in any way obligated by the General Conditions." Trustee Obj., ¶ 28.

*The Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure [10] states, in pertinent part, that a "party seeking to recover upon a claim ... may ... move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." The Rule further provides that the movant shall be granted summary judgment:

> If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56. Accordingly, in ruling upon a summary judgment motion, the Court is to determine whether a genuine issue of fact exists, not to resolve disputed issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

**10.** Rule 56 governs the motion for summary judgment in this adversary proceeding by virtue

of Fed.R.Bankr.P. 7056.

(1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor. *L.B. Foster Co. v. America Piles, Inc.,* 138 F.3d 81 (2d Cir.1998); *Matsushita, supra,* 475 U.S. at 587, 106 S.Ct. 1348. Factual allegations backed by affidavits or other evidence made by the party opposing the motion must be regarded as true and viewed in the light most favorable to the non-movant. *Cartier v. Lussier,* 955 F.2d 841 (2d Cir.1992).

The movant carries the initial burden of showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp., supra,* 477 U.S. at 325, 106 S.Ct. 2548; *In re J.T. Moran Fin'l Corp.,* 147 B.R. 335, 338 (Bankr.S.D.N.Y.1992), and the motion is to be granted only if (1) there is no genuine issue as to any material fact, and (2) the movant is entitled to judgment as a matter of law. Otherwise, it must be denied. *Anderson,* 477 U.S. at 247–52, 106 S.Ct. at 2506–11; *Hamilton v. Smith,* 773 F.2d 461, 466 (2d Cir.1985). The nonmoving party may oppose a summary judgment motion by making a showing that there is a genuine issue as to a material fact in support of a verdict for that party. *J.T. Moran, supra.* If there are "genuinely disputed material factual issues on which a factfinder might reasonably find for the party opposing summary judgment, summary judgment is inappropriate." *L.B. Foster Co., supra,* 138 F.3d at 87.

■ As an initial matter, the Court notes that the Trustee does not dispute any of the facts which entitle IFIC to subrogation: *i.e.,* that IFIC issued bonds requiring it to complete the project and pay laborers and materialmen in the event of QC's default in performance of the contract; that QC defaulted; that the contract was terminated by DASNY prior to the filing; and that IFIC was contractually required to, and did, complete the project and pay claims, to the tune of over $600,000. The Trustee has failed to raise a genuine issue of fact with respect to IFIC's entitlement to subrogation to DASNY's rights under the contract as against QC.

■ Thus, the first question to be addressed is: what rights does IFIC inherit by virtue of its subrogation to the rights of DASNY? IFIC contends that as a matter of law, it is entitled to the retainage to the exclusion of QC's estate—that pursuant to DASNY's contract with QC, QC has no interest in the retainage sufficient to confer upon those funds the status of property of the estate.

In the context of a contract dispute, the principles governing summary judgment are equally well established. The Court of Appeals for the Second Circuit has stated that as a general matter, summary judgment in a contract dispute is inappropriate unless the contract is "wholly unambiguous." *Mellon Bank, N.A. v. United Bank Corp.,* 31 F.3d 113, 115 (2d Cir.1994). The threshold question of whether a contract is ambiguous is a question of law for the court. *Alexander & Alexander Services, Inc. v. Underwriters at Lloyd's,* 136 F.3d 82 (2d Cir.1998). An ambiguous contract is one "which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Albany Savings Bank, FSB v. Halpin,* 117 F.3d 669, 673 (2d Cir. 1997). When a contract is ambiguous, its interpretation is a question of fact. However, the Circuit has also made clear that ambiguity alone is insufficient to preclude summary judgment; rather, "there must also exist relevant extrinsic evidence of the parties' actual intent." *Mellon, supra,* 31 F.3d at 116. Therefore, the rule in this Circuit is that where "the contract is ambiguous and there is relevant extrinsic evidence of the parties' actual intent, the contract's meaning is an issue for the trier of fact, and summary judgment is inappropriate." *L.B. Foster Co., supra,* 138 F.3d at 88 (citations omitted). "If the Court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact

necessarily exist." *Alexander, supra,* 136 F.3d at 86.

However, the Second Circuit has recently refined the rule. Even where the contract is ambiguous, summary judgment may be granted

> if under any of the reasonable interpretations the moving party would prevail. In such a case, the non-movant will have failed to show that there is any issue of material fact for trial; however the ambiguity were resolved, the movant would prevail. "If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment is appropriate.

*Chock Full O'Nuts Corp. v. Tetley, Inc.,* 152 F.3d 202, 204 (2d Cir.1998) *(quoting Bouzo v. Citibank, N.A.,* 96 F.3d 51, 56 (2d Cir.1996)).

In this case, the May 31, 1991 contract requires QC to comply with the "Contract Documents." On its face, it refers to other documents as being part of the contract, but it does not state what those documents are. It is therefore ambiguous. *See O'Neil v. Retirement Plan for Sal. Empl. of RKO Gen'l, Inc.,* 37 F.3d 55, 59 (2d Cir.1994) (fact that contract phrase "Incentive or Additional Compensation" was capitalized implied that it referred to specific type of payment and rendered contract ambiguous). In addition, IFIC has placed before the Court extrinsic evidence of what the phrase "Contract Documents" means. The General Conditions define the term "Contract" as including all of the Contract Documents, and define the term "Contract Documents" as including the General Conditions themselves.

At first blush, since the contract is ambiguous as a matter of law, and there exists relevant extrinsic evidence to aid in its interpretation, it appears that summary judgment would be inappropriate under the general rule in this Circuit. However, the Court believes that this case falls within the exception, rather than the general rule: that is, in this case, the Trustee has failed to place before the Court any evidence whatsoever, extrinsic or otherwise, to support his claim that the General Conditions do *not* apply.

He has not submitted any affidavits or documentary evidence. He does not dispute that the General Conditions define the phrase "Contract Documents" as including the General Conditions themselves. He does not dispute that Kennedy, on behalf of QC, signed bidding documents which refer to the General Conditions. He does not dispute that QC submitted monthly payment requisitions, which only the General Conditions provide for. Nor does he dispute that DASNY retained five percent of the payments it made, which only the General Conditions provide for. Under any reasonable interpretation of the evidence before the Court, IFIC must prevail on its claim that the General Conditions were a part of the contract between QC and DASNY. The Trustee has failed to raise an issue of fact for trial, and no rational trier of fact could find for the Trustee, given the complete absence of evidence supporting his position.

This position is further bolstered by a review of the Trustee's complaint wherein he alleges, in paragraphs 7 through 9, that

> 7. *Pursuant to the Contract,* the Debtor was entitled to and did make payment requisitions to the Dormitory Authority on a monthly schedule during the course of completion of the Contract ("Payment Requisitions").

> 8. *Pursuant to the Contract,* the Dormitory Authority paid the Debtor the amounts requested in each of the Payment Requisitions ("Payment Amount").

> 9. *Pursuant to the Contract,* the Dormitory Authority withheld five percent (5%) of the Payment Amount as retainage, for work which had already been completed pursuant to the Contract.

Compl. ¶ 7–9 (emphasis added). As noted, the document labeled "Contract" makes no reference to monthly payment requisitions or to retainage. It is only the General Conditions which provide for either one. The Trustee's own complaint therefore undercuts his unsupported Rule 22(b) Statement that the contract does not include the General Conditions, and that the General Conditions

are not binding on QC.[11] The Trustee's conclusory statements in his Rule 22(b) Statement concerning the nature of the facts do not create a genuine issue for trial, *see Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991), and are insufficient to defeat IFIC's properly supported motion. *Matsushita Elec. Indus., supra,* 475 U.S. at 586, 106 S.Ct. 1348.

Having determined that IFIC has assumed all of DASNY's contractual rights under principles of subrogation, that the General Conditions are a part of the contract, and that there is no dispute as to the terms of the General Conditions, the Court must now examine the effect of the equitable doctrine of subrogation upon the rights of the parties in this case.

*The Doctrine of Subrogation*

■ The New York courts have long recognized and enforced the doctrine of subrogation. The nature of subrogation has been described as follows:

> The right of subrogation or of equitable assignment is not founded upon contract nor upon the absence of contract, but is founded upon the facts and circumstances of a particular case and upon principles of natural justice, and generally where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in place of a creditor such person will be so substituted ... "[n]o contract is necessary upon which to base the right, for it is founded upon principles of equity and benevolence and may be decreed where no contract exists.... It was said by Chief Justice Marshall that equity would clothe the party thus paying with the legal garb with which the contract he has discharged was invested, and it would substitute the party paying to every

equitable interest and purpose, in the place of the creditor whose debt he has discharged."

*Pittsburgh–Westmoreland Coal Co. v. Kerr,* 220 N.Y. 137, 143, 115 N.E. 465, 467 (N.Y. 1917) (*quoting Pease v. Egan,* 131 N.Y. 262, 272, 30 N.E. 102, 104 (1892)). The doctrine has been repeatedly applied in cases involving sureties on construction contracts, and it is now irrefutable that a surety, after satisfying its obligations under either a payment or performance bond, is subrogated to the rights of the party he paid. *In re John's Insulation, Inc.,* 221 B.R. 683 (Bankr. E.D.N.Y.1998) (Feller, B.J.).

■ In fact, when a surety performs under its bond, it "stands in the shoes" of the other parties to the construction project, and it

> undertakes duties which entitle it to step into three sets of shoes. When, upon default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and materialmen who have been paid by the surety—who may have had liens; and not least, in the shoes of the government [owner], for whom the job was completed.

*National Shawmut Bank v. New Amsterdam Cas. Co.,* 411 F.2d 843, 845 (1st Cir.1969); *In re Modular Structures, Inc.,* 27 F.3d 72, 74 n. 1 (3d Cir.1994); *In re John's Insulation, Inc., supra,* 221 B.R. at 688. Courts have also acknowledged that a surety is subrogated not only to the rights of the project owner, but to the rights of the contractor. *See, e.g., Menorah Nursing Home, Inc. v. Zukov,* 548 N.Y.S.2d 702, 705, 153 A.D.2d 13, 17 (N.Y.A.D.1989) (the surety is subrogated "to any claims which the defaulting principal might have against third parties whose wrongful conduct allegedly was a cause of the

11. Under New York law, a contract may be formed by more than one writing. *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568 (2d Cir.1993). The Court is unpersuaded by the Trustee's protestations that the General Conditions were not executed by either QC or Kennedy, but even if this were not the case, New York law also provides that "signed and unsigned writings relating to the same transaction and

containing all the essential terms of a contract may be read together to evidence a binding contract." *Liberty Mgt. & Constr. Ltd. v. Fifth Ave. & Sixty–Sixth St. Corp.,* 620 N.Y.S.2d 827, 830, 208 A.D.2d 73, 79 (N.Y.A.D.1995) (plaintiff held bound to arbitration clause in General Conditions though it had never executed either General Conditions or the construction contract); *see also Consarc Corp., supra,* 996 F.2d at 572.

default ... [and] to the principal's right to contract payments which may have been retained by the owner-obligee" (citations omitted)).

The United States Supreme Court has had several occasions to address the doctrine of subrogation and its effect upon the competing interests of sureties, project owners, laborers and materialmen. *See, e.g., Prairie State Nat'l Bank v. United States,* 164 U.S. 227, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896); *Henningsen v. United States Fidelity & Guar. Co.,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); and *United States v. Munsey Trust Co.,* 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). Rather than duplicate the exhaustive efforts of several other bankruptcy judges to "navigate[ ] a thicket of public construction cases," *see In re Pyramid Industries,* 170 B.R. 974 (Bankr. N.D.Ill.1994), *aff'd* 210 B.R. 445 (N.D.Ill. 1997) and *In re RAH Development Co.,* 184 B.R. 525 (Bankr.W.D.Mich.1995), this Court will merely summarize their findings: under *Prairie State Nat'l Bank,* a performance bond surety who completes performance of a construction contract is equitably subrogated to the rights of the project owner to payment from contract retainage, and its equitable interest in the retainage arises when it becomes surety, even though the retainage fund is not yet in existence. Under *Henningsen,* the same rule applies to payment bond sureties. Under *Munsey Trust,* a project owner's right to setoff monies owed to the debtor against monies the debtor owes to the project owner is superior to the surety's right of subrogation and entitlement to the retainage. All of these cases involved federal, public construction projects; none were decided in a bankruptcy context; and none discuss the concept of property of a bankruptcy estate.

The sole United States Supreme Court case which *did* address these issues in a bankruptcy context is *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), a case factually similar to the one at bar, but decided prior to the enactment of the Bankruptcy Code. The facts of *Pearlman* are as follows: in 1955, Dutcher Construction Corporation ("Dutcher") entered into a contract with the United

States to work on a construction project. The terms of the contract allowed the government to retain a percentage of monthly progress payments until final completion of the work. At the same time, Reliance Insurance Company ("Reliance"), as Dutcher's surety, provided performance and payment bonds for the project. Prior to completion of the contract, Dutcher had financial problems and its contract was terminated. Another contractor completed the work, and Reliance paid approximately $350,000 to Dutcher's subcontractors. At the time, the government was holding approximately $88,000 of retainage, "which would have been due to be paid to Dutcher had it carried out its obligation to pay its laborers and materialmen." *Pearlman,* 371 U.S. at 134, 83 S.Ct. 232.

The government paid over that sum to Dutcher's bankruptcy trustee, and Reliance filed a petition in the United States District Court for the Western District of New York contending that it owned the funds free and clear of the Trustee's claims. The referee in bankruptcy, relying upon the *Munsey Trust* case, *supra,* held that the surety was entitled only to share in the money equally with Dutcher's general unsecured creditors. The District Court disagreed, holding that cases prior to *Munsey* had established that the surety was entitled to priority over general creditors, and that *Munsey* had not changed that rule. *In re Dutcher Constr. Corp.,* 197 F.Supp. 441 (W.D.N.Y.1961). The Court of Appeals for the Second Circuit affirmed the District Court. *In re Dutcher Constr. Corp.,* 298 F.2d 655 (2d Cir.1962). The United States Supreme Court framed the issue as follows:

> One argument against the surety's claim is that this controversy is governed entirely by the Bankruptcy Act and that § 64, ... which prescribes priorities for different classes of creditors, gives no priority to a surety's claim for reimbursement. But the present dispute—who has the property interests in the fund, and how much—is not so simply solved. Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankruptcy's estate is quite another.

Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors. So here if the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankruptcy.... Consequently our question is not who was entitled to priority in distributions under § 64, but whether the surety had, as it claimed, ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication.

*Pearlman, supra,* 371 U.S. at 135–36, 83 S.Ct. 232. The Supreme Court, following the established rule that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed," held that "the Government had a right to use the retained fund to pay laborers and materialmen: that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it." *Pearlman, supra,* 371 U.S. at 141, 83 S.Ct. 232. The Court reached its result without reference to section 70 of the Bankruptcy Act, which defined the parameters of property of the estate.

Therefore, under *Pearlman* and its progeny, it is clear that prior to the enactment of the Bankruptcy Code in 1978,

neither the contractor as a debtor or his trustee in bankruptcy acquire[d] any property interest in the unpaid contract proceeds (earned but unpaid, unearned, or retentions) to the extent those proceeds [were] necessary to reimburse the surety for its costs of completion and its payment of labor and material bills. Whether the surety's interest was characterized as an ownership interest, an equitable lien, or a prior right, this property interest could not be administered, liquidated, or distributed to the general creditors. It was not an asset of the estate.

William F. Haug & Janis M. Haug, *Bankruptcy 1984 vs. the Surety's Right to Contract Proceeds ("Bankruptcy 1984")*, 20 Forum 725, 731 (1985).[12]

The present controversy requires this Court to determine whether *Pearlman's* holding emerges unscathed after consideration of Section 541 of the Bankruptcy Code.

*Property of the Estate under the Bankruptcy Code*

■■■ A fundamental purpose of bankruptcy law is "to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors." *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 91 (2d Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102

---

**12.** One bankruptcy court's analysis of pre-Code law led it to conclude that the proceeds of federal government construction contracts must be distributed according to the following priority scheme: first, to valid offset claims of the contracting government agency; next, to unpaid subcontractors and sureties who have either paid subcontractors under a payment bond or completed the contract pursuant to a performance bond; next, to assignees of the general contractor, including secured creditors; and last, to the general contractor (or its bankruptcy trustee). *In re Pyramid Industries, Inc.,* 170 B.R. 974 (Bankr.N.D.Ill.1994), *aff'd* 210 B.R. 445 (N.D.Ill. 1997). The dispute in that case was between a secured creditor which had extended loans to the Debtor/prime contractor in order to perform its contract with the Navy and unpaid subcontractors. The court assumed, without discussion, that the approximately $50,000 in contract proceeds was property of the chapter 7 estate. The court concluded that the secured creditor, an agency of the United States, was not the project's "owner" for purposes of determining its right to setoff and it therefore did not have a valid right of offset; thus, the rights of the unpaid subcontractors to the contract proceeds were superior. The rights of a surety were not at issue.

L.Ed.2d 145 (1988) (*quoting In re Chanticleer Assoc., Ltd.*, 592 F.2d 70, 73–74 (2d Cir.1979)). To that end, 11 U.S.C. § 541 provides that the commencement of a bankruptcy case creates an estate, which "is comprised of all of the following property, wherever located and by whomever held: 1) ... all legal or equitable interests of the debtor in property as of the commencement of the case." Although the question of whether a debtor's interest in property is property of the estate is a question of federal law, the nature and extent of the debtor's interest in property is determined by applicable nonbankruptcy law. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Prudential Lines, Inc.*, 928 F.2d 565 (2d Cir.), *cert. denied*, 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991).

IFIC points out that the New York courts have held that the contractors in construction cases have no property interest in contract retainage where a surety has stepped in upon the contractor's default. For example, in *United States Fidelity & Guar. Co. v. Triborough Bridge Authority*, 297 N.Y. 31, 74 N.E.2d 226 (1947), a surety sued to impress an equitable lien on funds held by the Triborough Bridge Authority ("TBA"). In that case, the facts were as follows: in 1940, the TBA entered into a contract with Petracca & Banko, Inc. ("Contractor") for construction work, and the Contractor furnished both performance and payment bonds by United States Fidelity & Guaranty Co. ("USF & G"). The contract gave the TBA the right to withhold, out of any payments due the Contractor, any sums necessary to assure payment of all bills for labor and materials. The Contractor completed the work, which was accepted by TBA, which was holding approximately $100,000 representing the final payment due. However, the Contractor had not paid some $55,000 to subcontractors. In July and August of 1942, USF & G paid the subcontractors. But in May of 1942, the Internal Revenue Service assessed over $174,000 in income taxes against the Contractor, and it filed a notice of lien in June 1942. USF & G and the IRS both claimed that they were entitled to the funds held by the TBA. The New York Court of Appeals held that USF & G succeeded under principles of

subrogation to all of TBA's rights, including the right to apply withheld sums to the payment of unsatisfied claims for labor and materials. The Court of Appeals stated:

> We are here dealing with the contract which contained the right to retain earned moneys and apply them on the cost of any completed work. To all rights under this contract the bonding company was subrogated. The equity in favor of the surety company arose at the time of the giving of its bond. The right became available when the surety company completed the work at a loss.... In the present case applying the rule thus announced plaintiff's lien, created in July of 1940, when the bond was executed, was prior and superior to [the IRS's] lien which did not come into being until 1942.

*Id.*, 297 N.Y. at 36, 74 N.E.2d at 227 (citations omitted).

In *United States Fidelity*, the Court of Appeals distinguished the *Munsey* case, *supra*, on the ground that the project owner in *Munsey* asserted a claim of its own by way of setoff and was not a mere stakeholder, as was the TBA. More importantly, the Court of Appeals also noted that the IRS's right to the funds

> can be no greater than those which its taxpayer the contractor had. Here the contractor's rights to the fund were clearly subordinate to the right of [TBA] and, by subrogation, of [USF & G] to withhold and apply those moneys to the payment of unsatisfied claims for labor and materials. So long as such claim were outstanding and unpaid and so long as defendant [TBA] had the right to withhold and apply, the contractor had no rights to the fund, and, consequently, no property interest therein upon which [the IRS] could place a lien.

*Id.*, 297 N.Y. at 37, 74 N.E.2d at 228.

Those principles, though expounded a half-century ago, endure today. *See, e.g., City of New York v. Cross Bay Contracting Corp.*, 662 N.Y.S.2d 462, 235 A.D.2d 10 (N.Y.A.D. 1997). In that case, Cross Bay Contracting Corp. ("Cross Bay") contracted with the New York City Department of Sanitation for con-

struction at a landfill. Colonia Insurance Company ("Colonia") provided payment and performance bonds to the City on Cross Bay's behalf. The City ultimately terminated the contract, and Colonia made payments totaling $127,000 to subcontractors after Cross Bay defaulted. There were several competing claimants to the contract proceeds: Colonia, as surety; several subcontractors with liens and restraining notices; the New York State Commissioner of Labor for unpaid unemployment insurance; and the United States Internal Revenue Service. The City, as stakeholder, commenced an interpleader action to determine the competing claims to the funds. On appeal, the Appellate Division granted summary judgment in favor of the surety, holding that under the terms of the contract, the City was entitled to withhold from Cross Bay monies to satisfy the claims of unpaid subcontractors, and apply such sums toward payment of their claims. Colonia was subrogated to the City's rights, and the court held that it

> may use the contract funds to apply the funds to payments made and to be made under the payment bond. It is clear that Colonia's right to the interpleaded fund is superior to that of the other claimants, who are entitled only to funds "due or to become due" to the debtor, Cross Bay. No monies, however, are or will be due Cross Bay, since its rights are subordinate to those of the City and, by subrogation, subordinate to those of Colonia.

*Id.,* 662 N.Y.S.2d at 465, 235 A.D.2d at 15.

The majority of bankruptcy courts, albeit none in this district, have concluded that retainage is not property of the debtor-contractor's estate where there has been a pre-petition default and a surety has stepped in under its bonds. For example, in *In re Pacific Marine Dredging & Constr.,* 79 B.R. 924 (Bankr.D.Or.1987), the debtor-contractor entered into a construction contract which required it to provide payment and performance bonds and to pay its subcontractors promptly upon their performance of work. The contract (and Oregon state law) provided that the owner would retain 5% of progress payments to the debtor. The debtor substantially completed the project, but did not pay all of its subcontractors; rather, the surety paid them post-petition under the payment bond. Upon the debtor's bankruptcy filing, the project owner paid the final progress payment (including retainage) into court and commenced an adversary proceeding to determine competing claims to the fund. The court undertook a two-tier inquiry: it first concluded that under Oregon law, the surety had an equitable right to or lien on the funds which was superior to the claims of both the debtor and its creditor (which held a perfected security interest in accounts receivable). Having defined the parties' rights to the fund under state law, the court next examined those rights in the context of 11 U.S.C. § 541. The court concluded that since the debtor breached the contract by not paying its subcontractors and the owner had exercised its contractual right to withhold payment, the owner "is not contractually obligated to pay the fund to debtor. Due to debtor's breach of contract, the debtor does not have any legal or equitable interest in the fund. Accordingly, the fund is not property of the estate. In addition, [the bank's] security interest cannot attach to funds in which the debtor has no rights." *Id.,* 79 B.R. at 929 (citations omitted). The *Pacific Marine* court therefore held that the surety was entitled to the fund, citing *Pearlman.*

Similarly, the bankruptcy court in *In re Ward Land Clearing & Drainage, Inc.,* 73 B.R. 313 (Bankr.N.D.Fla.1987), was called upon to rule whether a surety, or a bank to whom the debtor's accounts receivable had been assigned, was entitled to sums due under the contract. The court stated:

> Prior to default, [the contractor] had the right to assign progress payments to the bank. Upon default, however, [the contractor] forfeited its rights under the construction contract and the surety, bound under the contract of suretyship, became obligated to complete performance. As assignee of the proceeds of the contract, [the bank] could acquire no right by assignment superior to the right the contractor himself might assert against the owner. When [the surety] undertook to complete the job, it performed "a benefit for the [owner], and has a right to the retained funds and remaining progress money to defray its

costs. The surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the government."

*Id.,* 73 B.R. at 316 (*quoting Trinity Universal Ins. Co. v. United States,* 382 F.2d 317, 320 (5th Cir.1967)).

The Court of Appeals for the Third Circuit has squarely held that the enactment of Section 541 has not eviscerated *Pearlman.* In *In re Modular Structures, Inc.,* 27 F.3d 72 (3rd Cir.1994), the debtor contracted with the Salvation Army for construction of new headquarters. First Indemnity of America Insurance Company ("First Indemnity") bonded the project. Shortly thereafter, First Fidelity Bank (the "Bank") lent the debtor money and took back a security interest in the debtor's accounts receivable, which it perfected by filing a UCC financing statement. Almost two years later, the debtor filed for relief under chapter 7. A dispute arose between First Indemnity, which had paid the claims of the debtor's subcontractors, and the Bank, which claimed a security interest in the contract proceeds. First Indemnity argued that because the Debtor had breached its contract, none of the funds held by the Salvation Army were owing to the debtor, and thus could not be property of the estate or subject to the Bank's lien. The Court of Appeals for the Third Circuit agreed, relying on the *Pearlman* case and New Jersey's incorporation of the *Pearlman* doctrine into New Jersey common law. The Third Circuit stated that "the adoption of the Bankruptcy

Code in 1978 has not undercut *Pearlman's* vitality." 27 F.3d at 78, n. 1. It therefore held "as a matter of law, that, assuming the facts are as the present record indicates, the funds held by the Salvation Army are not properly part of the estate in bankruptcy." *Id.* at 77.[13]

The Bankruptcy Court in *In re Four Star Construction Co.,* 151 B.R. 817 (Bankr. N.D.Ohio 1993), used a slightly different theory but came to the same result. In that case, the surety had bonded a project for the debtor. Upon the debtor's default, the surety paid the claims of laborers and materialmen. The project owner was holding "undistributed contract funds." Having paid the claims of subcontractors (who then executed assignments, releases and guarantees in favor of the surety), the surety claimed that it had an equitable lien on the contract proceeds and that the funds were not property of the bankruptcy estate. The Court, using principles of subrogation and 11 U.S.C. § 509, agreed, finding that "the contract funds in [the owner's] possession are not estate property to the extent of [the surety's] subrogation rights." *Id.,* 151 B.R. at 823.

The bankruptcy courts in this and neighboring districts have, by and large, cited *Pearlman* with approval even after the enactment of Section 541, albeit in other contexts. *See, e.g., In re John's Insulation, Inc.,* 221 B.R. 683 (Bankr.E.D.N.Y.1998) (Feller, B.J.) (holding that defaulting contractor was precluded from suing surety to recover retained contract proceeds, since surety was subrogated to owner's rights and

---

**13.** The Trustee argues that *Modular Structures* considered the *Pearlman* doctrine in the context of a more fully developed factual record than exists in the present case. The Trustee is correct when he points out that the Third Circuit ultimately remanded the case to conduct a further hearing. The Third Circuit stated: "the extent to which Modular failed to pay its subcontractors has never been documented adequately. Nor did the bankruptcy court undertake to explore whether Modular had any other basis upon which to claim the funds being held by the Salvation Army. We conclude that further proceedings may be necessary...." *Id.* at 80. The Trustee seizes upon this language and argues that the Court must make a factual determination that the Debtor is not entitled to the retainage, and that IFIC and DASNY have not

proffered sufficient evidence. Specifically, he contends that the Court cannot make a factual determination that the General Conditions apply. As discussed earlier, however, the Court finds that the Trustee has utterly failed to raise an issue of fact on this motion with respect to that point. In addition, the Trustee contends that "evidence must be presented and analyzed regarding the purported default of the Debtor ... whether the purported default of the Debtor occurred pre- or post-petition may be crucial." *Trustee Obj.,* ¶ 25. But, as noted, the Court finds that the date of default (May, 1993) is undisputed. Moreover, the Trustee does not dispute that the Debtor defaulted in the first instance. In short, despite his call for a hearing, the Trustee has not pointed to any factual disputes which warrant one.

contractor's rights, and has the right to contract payments of any retainage, earned but unpaid funds and unearned proceeds); *In re ADL Contracting Corp.,* 184 B.R. 436 (Bankr.S.D.N.Y.1995) (finding that surety's claim to proceeds of settlement of breach of contract suit between debtor-contractor and town was superior to claim of judicial lien creditor, though not to claim of unpaid subcontractor; since debtor claimed no interest in the funds, the court did not reach the issue of whether the retainage was property of the estate); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr.S.D.N.Y.1990) (holding that guarantor of leases which paid post-petition rent to lessors upon debtor's default was entitled to assert all the lessor's rights, including its right to an administrative priority, by virtue of doctrine of subrogation). *See also* J. Michael Frank & Michael E. Evans, *A Defense of Established Landmarks: Claims of Construction Sureties to Contract Funds under Chapter 11,* 25 Tort & Ins.L.J. 28 (1989) ("subrogation is as old as Roman law. *Pearlman* did not give birth to it, and the Bankruptcy Code did not kill it").

The Trustee cites *In re Glover Construction Co.,* 30 B.R. 873 (Bankr.W.D.Ky.1983), for the proposition that *Pearlman* did not survive the Code. In that case, significantly different from that found here, the debtor-contractor *was performing* its construction contracts when it filed for bankruptcy reorganization. The surety which had bonded the project sought a declaration that it was the owner, and entitled to control the disposition, of the progress payments to be made. It asserted that such progress payments are not property of the estate under Section 541 on an equitable subrogation theory. The bankruptcy court, in a lengthy and thoughtful opinion, "distinguish[ed] away the leading Supreme Court case" which, of course, was

*Pearlman. Id.,* at 876. It did so on the ground that *Pearlman* involved a dispute about contract *retainage,* not progress payments. The court found the distinction "crucial." *Id.,* at 877. It considered "the critical characteristics of progress payments ... [which] are periodic cash receipts from the owner *consequent to an enforceable contract." Id.* at 879. In fact, the *Glover* court hinted that *Pearlman* would control its analysis were contract retainage at issue.[14]

This Court also believes that the distinction between a dispute involving contract retainage after the debtor-contractor's pre-petition default (the *Pearlman* situation) and one involving progress payments to a performing debtor-contractor (the *Glover* situation) is real; this case, of course, involves the former. In the *Glover* situation, the performing debtor remains entitled to the progress payments once they are earned. In the case presently pending, the Debtor has defaulted and the surety, by completing the project and paying laborers and materialmen, has stepped into the shoes of the Debtor, prior to the filing.[15] Whatever rights the debtor had in the contract passed to the surety by virtue of the doctrine of subrogation, prior to bankruptcy.

The Court of Appeals for the Sixth Circuit in *In re Construction Alternatives, Inc.,* 2 F.3d 670 (6th Cir.1993), held that the debtor-contractor had a property interest in the final progress payment of a construction contract (despite a surety's payment of subcontractors), and the progress payments was therefore property of the estate. The Court agrees with IFIC, however, that the *Construction Alternatives* case is distinguishable from the instant case because, as the Court of Appeals for the Sixth Circuit pointed out, the project owner "had no right under its

---

**14.** At the time of the surety's motion, its potential liability on the bonds was unknown. By the time the Court considered the surety's motion to modify judgment, however, the court observed:

> That there will be liability is now beyond doubt. The combined scheduled retainage is $613,000; [the surety] at this writing already has paid $1,244,000 in claims. Without now deciding the question, it appears that [the surety] will have a *Pearlman*-type claim against most, if not all, of the retainage fund.

*Id.,* 30 B.R. at 882, n. 28.

**15.** It is not significant that the actual checks were drawn by the surety after the date of the petition, as the default occurred pre-petition and the surety's subrogation rights became enforceable at that time. Its subrogation rights accrued, of course, when it executed the bonds. *See United States Fidelity & Guar. Co. v. Triborough Bridge Authority, supra,* 297 N.Y. 31, 74 N.E.2d 226.

contract with [the debtor] to retain any portion of progress payments to insure payment of unpaid suppliers and contractors." *Id.*, 2 F.3d at 674, n. 3.[16] Rather, it was "undisputed that the work on the project was complete at the time that [the debtor] petitioned for bankruptcy ... [t]here were several bookkeeping and administrative matters ... to be completed and several subcontractors to be paid, but [the debtor] owed nothing to the [project owner] and therefore, no payments to the [project owner] were required or other expenses incurred to perfect [the debtor's] claim to the final progress payment.... Thus, we conclude that [the debtor] had earned the right to receive its final progress payment...." *Id.*, 2 F.3d at 674.[17]

Similarly, in *In re Wm. Cargile Contractor, Inc.*, 203 B.R. 644 (Bankr.S.D.Ohio 1996), the court held that the final payment under a completed construction project was property of the debtor's estate, notwithstanding the fact that a surety had been called upon to pay laborers and materialmen. However, the court did so because of the "preeminent" distinction between cases in which the contract provides for retainage and cases in which the contract contains no such provision. The contract in the instant case provides for retainage, and it is the retainage itself which is at issue. Therefore, the Court believes that *Pearlman* requires it to find, on the undisputed facts before it, that the retainage is not property of QC's estate as a matter of law. *See Bankruptcy 1984, supra,* 20 Forum at 747 ("Clearly the law has not changed in the *Pearlman*-type situation. When at the time of the filing of the bankruptcy petition the work is complete but the debtor has defaulted in paying its labor and material obligations and the surety has paid them, the estate has no property interest under § 541 in the contract proceeds. The

reason is obvious, because of the debtor's default and the surety's payment prior to filing, the surety by default has assumed all of the debtor's rights. The debtor has none.").

The Trustee also relies upon *In re Nemko*, 143 B.R. 980 (Bankr.E.D.N.Y.1992), decided by Chief Bankruptcy Judge Conrad B. Duberstein. In *Nemko*, Chief Judge Duberstein held that "an admitted liability owed to a debtor under a contract is property of the estate, even thought the debtor's subcontractors may have claims against parties to the contract." *Id.*, 143 B.R. at 985. The Court noted that *Pearlman* was decided under the Act, not the Code, which defines property of the estate more broadly than pre-Code law. However, as Chief Judge Duberstein pointed out, the subrogation rights of a surety were not at issue in *Nemko*. Rather, the *Nemko* case involved "the rights of a subcontractor to receivables due to a debtor-general contractor." *Id.* at 986. There had been no default by the debtor in *Nemko*, nor a corresponding termination of the contract (and the debtor's rights thereunder) prior to the filing. Moreover, there was no dispute in *Nemko* that the project owner owed money to the debtor. The money was therefore an account receivable and property of the debtor's estate.

The Trustee, citing *Safeco Ins. Co. v. State of New York*, 89 Misc.2d 864, 392 N.Y.S.2d 976 (N.Y.Ct.Cl.1977), also argues that IFIC must show factually that no other claimant would have a higher and better claim to the retainage. The Court disagrees. First, the Court notes that DASNY has submitted an affidavit stating that "there are no other known claims" against the retainage. *Boiko Aff.*, ¶ 7. In addition, IFIC's Rule 22(b)

---

16. The Trustee contends that there has been no showing that DASNY has a contractual right to withhold retainage to pay laborers, and therefore this case is like *Construction Alternatives*, since neither IFIC nor DASNY have shown that QC is bound by the General Conditions, which contain the relevant provisions. For the reasons noted earlier, however, the Court disagrees and finds that the General Conditions are part of the contract between DASNY and QC, and that they authorize DASNY to use the retainage to satisfy the claims of laborers and materialmen.

17. The Sixth Circuit distinguished its case from *Pearlman* on this ground. It concluded that the surety's subrogation to the rights of the owner earned it nothing, since the owner had no contractual right to retain funds. Similarly, its subrogation to the rights of the subcontractors it had paid did not give it a superior right to the progress payment, since the subcontractors, having failed to file mechanics liens under state law, had no right to the progress payment.

Statement avers that "there are no asserted claims by any taxing or other governmental authority against the retainages." *IFIC's 22(b) Statement,* ¶ 16. The Trustee has not submitted any evidence on this point. The Trustee's Rule 22(b) Statement merely states, that "unknown claimants may have a higher and better claim" to the retainage. But the Trustee must "do more than demonstrate the existence of some metaphysical doubt as to the material facts"—he must "produce 'specific facts showing that there is a genuine issue for trial.'" *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 146 (2d Cir.1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). This, he has failed to do.

Even assuming, however, that the Trustee had adequately raised an issue of fact as to the existence of other claimants, the Court does not believe that *Safeco* requires the result urged by the Trustee. The *Safeco* court held that the State of New York, as project owner, was entitled to set off against contract retainage [18] amounts due from the contractor for sales taxes, relying upon the Supreme Court's *Munsey* case, *supra.* However, the Court does not believe that *Safeco* is controlling here, for several reasons. First, DASNY is *not* the State, and would have no right of setoff with respect to debts owed the State by QC. Rather, DASNY was created by New York's Public Authorities Law, which provides that it is "a body corporate and politic constituting a public benefit corporation." N.Y.Pub.Auth.L. § 1677 (McKinney 1981 & Supp.1998). A public benefit corporation is "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof." N.Y.Gen. Const.L. § 66(4) (McKinney 1951 & Supp.1998). A public benefit corporation is "separate and judicially distinct from the state." *Hyde Park Fire & Water Dist. v. Dutchess County,* 97 Misc.2d 104, 106, 410 N.Y.S.2d 783, 785 (N.Y.Sup.Ct.1978). DAS-

NY is therefore distinct from the state. *Riverhead Transit Mix Corp. v. Walsh Constr. Co.,* No. 091–7142–511 (Bankr.E.D.N.Y. June 29, 1995) (unreported decision).

In addition, the *Safeco* decision stands alone in New York. In *Firemen's Insurance Co. v. State,* 397 N.Y.S.2d 524, 91 Misc.2d 183 (N.Y.Ct.Cl.1977), the court questioned the result in *Safeco.* The *Firemen's Insurance* court held, largely premised upon the decision of *Trinity Universal Ins. Co. v. United States,* 382 F.2d 317 (5th Cir.1967), *cert. denied,* 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968), that the State could *not* set off. Both *Firemen's Insurance* and *Trinity* found *Munsey* inapplicable where the surety has not only paid subcontractors under a payment bond, but where it has also completed performance of the contractor. In this case, IFIC has done both. The *Firemen's Insurance* court found the logic of *Trinity* to be "undeniable," and stated as follows:

> There is no dispute that the retainage amounted to moneys which were earned but were unpaid prior to the contractor's default. Upon the default, the surety became obligated to complete the work and stepped into the shoes of the State, not of the contractor which on default, had forfeited its rights. It became subrogated not only to the right of the State to pay laborers and materialmen from funds retained out of progress report [sic], but also the State's right to apply to the cost of completion the earned but unpaid progress payment in its hands at the time of the default .... [w]hen the surety was called to perform under the bond, the State also had certain obligations and one of those obligations was the payment of the full contract price as agreed to with the original contractor. It appears unfair and inequitable to deny the claimant surety the right to recover the retainage under the contract since the surety is entitled to have the full contract price applied to the performance of the contract.

*Firemen's Insurance,* 397 N.Y.S.2d at 528.[19] The holding in *Firemen's Insurance* was

---

18. The *Safeco* court held that the State could *not* set off with respect to funds representing work which was not completed by the contractor, since the contractor had not done the work to

earn those funds and therefore, the funds were not owed to the contractor.

19. These statements are arguably *dicta,* however, because the *Firemen's Insurance* court ultimately

subsequently affirmed by the Appellate Division. *See Firemen's Insur. Co. v. State,* 412 N.Y.S.2d 206, 65 A.D.2d 241 (N.Y.A.D.1979).

■ The Court acknowledges that the language of *Safeco,* which referred to the retainage as "property of [the contractor] in the State's hands" could be read to mean that the contractor has a property interest in the retainage within the meaning of Section 541. As an alternative to this Court's conclusion that the retainage is *not* property of the estate, the Court believes that any property interest the contractor has under a *Safeco* theory is but bare legal title only, and that the surety has the equitable interest in property. In such a case, Section 541(d) governs, and QC's estate succeeds to that same interest—*i.e.,* bare legal title only. Under this rationale, the Trustee is still not entitled to recover it or seek its turnover.[20]

11 U.S.C. § 541(d) provides in pertinent part:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

*See also In re RAH Development Co.,* 184 B.R. 525, 527, n. 1 (Bankr.W.D.Mich.1995) (to "conclud[e] that contract retainage funds fall within the definition of property of the estate does not destroy *Pearlman's* essential holding that laborers and materialmen have equitable rights to those funds"). As noted by one scholar:

> The courts have been struggling with the new concept of "property of the estate" as defined under § 541 of the new Code.... [T]his new concept should not significantly affect the surety's rights in the bonded contract proceeds. The courts are for the most part finding that the surety in a bankruptcy situation has the right to see that the contract proceeds are first paid to those who created the fund (laborers and materialmen) and to reimburse the surety before the debtor can use them to pay other expenses or the funds can be paid to general contractors. In this context it may make little difference to the surety whether the proceeds are deemed property of the estate or not.

*Bankruptcy 1984, supra,* 20 Forum at 747.

For all of the foregoing reasons, IFIC's motion, in which DASNY has joined, is granted.

### CONCLUSIONS

1. The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the Eastern District of New York. This a core proceeding. 28 U.S.C. § 157(b)(2)(A), (E). Venue is proper. 28 U.S.C. § 1409.

2. The retainage is not property of the estate.

3. To the extent the retainage is property of the estate, the Trustee is still not entitled to recover it or to seek its turnover, as the estate takes subject to IFIC's equitable right to the fund.

Counsel for IFIC is directed to settle on notice an order granting its motion, with separate judgment on the complaint, *see* FED. R.BANKR.P. 9021, within ten days hereof.

---

found it unnecessary to disagree with *Safeco* since the State had sent the surety a letter stating that there were no other claims to the fund, and the court held the State to its word.

**20.** Nor does the Court believe that it would be appropriate for the Trustee to seek commissions on the retainage.